551 So.2d 151 (1989)
Donald Eugene McNEAL
v.
STATE of Mississippi.
No. 58333.
Supreme Court of Mississippi.
July 6, 1989.
Rehearing Denied October 11, 1989.
F. Holt Montgomery, Gulfport, for appellant.
Mike Moore, Atty. Gen. by John R. Henry, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and SULLIVAN and ANDERSON, JJ.
DAN M. LEE, Presiding Justice, for the Court:
Today's appeal is from an adverse ruling of the Circuit Court of Jackson County, Mississippi. On June 6, 1986, Donald Eugene McNeal was convicted of the crime of murder and sentenced to serve a term of life imprisonment in the Mississippi Department of Corrections.
Aggrieved by the lower court's final order, Donald McNeal appeals and assigns as error:
I. The Lower Court Erred in Refusing to Grant Defendant's Jury Instruction on Circumstantial Evidence.
II. The Lower Court Erred in that the Evidence, Being Circumstantial, was Insufficient to Support a Guilty Verdict. Alternatively, the Jury's Verdict was Contrary to the Great Weight of the Evidence.

*152 III. The Appellant was Denied the Effective Assistance of Counsel.
IV. The Lower Court Erred in Allowing Photographs of the Deceased's Body into Evidence.
V. The Lower Court Erred in Admitting into Evidence the Tape Recording of Appellant's Telephone Conversations.
VI. The Lower Court Erred in Allowing an Unqualified Witness to Testify as to the Probable Disposition of Life Insurance Proceeds in the Event of a Conviction.
Finding error in assignment IV, we reverse and remand this case for a new trial.

STATEMENT OF THE FACTS
Donald Eugene McNeal (hereinafter "McNeal") met his future wife, Darlene Collier McNeal (hereinafter "Darlene"), while both were on active duty in 1981 as medical technicians in the Air Force. The couple began to date in late 1981 and in early January of 1982. They continued to see each other after they were both transferred to Keesler Air Force Base in Biloxi, Mississippi. On June 4, 1982, Donald and Darlene were married in Darlene's hometown, Bay St. Louis, Mississippi.
The McNeals continued to live on the Mississippi Gulf Coast after they were married and discharged from the Air Force. McNeal took a position as an officer with the Biloxi Police Department. Soon thereafter, the couple was blessed with a daughter, April Dawn. At this time, they bought a home in a subdivision of neighboring Ocean Springs, Mississippi. The McNeals made a sizeable down payment on the house and kept their monthly payments to a minimum of $159.
According to McNeal, he and his wife had an unusual marriage relationship. Darlene had her own set of friends who never visited in the McNeal home. She enjoyed the Biloxi night life, going out to various local bars and lounges on an average of three or four times a week. McNeal, on the other hand, would not accompany her and her friends on these occasions, preferring to stay at home with their daughter, April Dawn. However, McNeal, a native of West Virginia, did have one or two close male friends with whom he would occasionally go out for a drink. One of these friends was a man by the name of Shawn Darsey.
The McNeals received a set-back when McNeal was discharged from the Biloxi Police Department. According to McNeal, his discharge surrounded his giving numerous traffic citations in the Sunkist Country Club area. McNeal stated, "I was brought into the inspector's office and told in no uncertain terms not to use any direct control techniques in that area." McNeal retained counsel, and his Civil Service appeal was set to be heard soon after the incident in question. Due to his arrest, after Darlene's death, the hearing concerning his discharge never took place.
In spite of McNeal's termination from the police force, the family was able to survive this hard time through Darlene's two jobs. Darlene worked both as a secretary for the Ross-King-Walker Insurance Agency and, in the evening, as a cocktail waitress for the Golden Turtle Lounge in Biloxi. She also had her income from active status in the Air Force Reserve. McNeal, while waiting for reinstatement to the police force, cared for April Dawn, then three years old. McNeal and Darlene were confident that his position would be restored after the Civil Service hearing.
While McNeal was still on the police force, he and Darlene began to receive various crank calls, some from traffic offenders whom he had arrested. Consequently, he had his telephone number unlisted. When these calls continued, McNeal installed a recently-developed device by which only persons possessing special "access codes" could call his house. Additionally, unbeknownst to Darlene, McNeal also installed a tape recorder which automatically recorded all telephones conversations made to the McNeal home.
On September 2, 1985, hurricane Elena ravaged the Gulf Coast. The McNeals evacuated to Jackson, where McNeal, Darlene and April Dawn spent a few nights in *153 a hotel. Before leaving their home, the McNeals secured Donald McNeal's eight-week-old puppy in the kitchen area. They realized they could not take him to a hotel.
After the hurricane, the McNeals returned to their home. They found that their house had suffered storm damage. Several trees and large limbs were down, including some on the roof, causing leakage and water damage to the ceiling of their home. The ceiling insulation was saturated. According to McNeal, at Darlene's request, he left the living room windows open to equalize the expected hurricane pressure. Consequently, part of the living room carpet was drenched. Additionally, the family dog had escaped from the kitchen and urinated all over the rest of the carpets in the house. The family's ability to clean up the mess was limited by the fact that they were without electric power for three weeks after they returned. To cope with this situation, McNeal purchased a generator and also a large 12-volt maintenance-free car battery, to which he hooked up hand-held lights to maintain some visibility after dark.
The McNeals were obviously anxious to get their home back into shape. Darlene was admittedly more enthusiastic about Don cleaning up and painting the house than Don himself was, a fact which caused some friction between them. However, McNeal promised Darlene that the house would be completely redone on the last weekend of the month, which would have been the dates of September 27, 28 and 29, 1985.
Prior to this time, McNeal had already spent one day helping to clean up the hurricane damage and debris at the home of his good friend, Shawn Darsey. In return, Darsey and another friend named Marvin Foster had agreed to help McNeal repair the damage to his home, including replacing the water-soaked insulation and painting the damaged walls. The day for the clean-up was set to take place on Sunday, September 29, when all three men would be free. According to McNeal, this plan was made one to one-and-one-half weeks prior to the specified date. McNeal bought the paint for the job on Friday, September 27, 1985, at the local K-Mart. That same day, Friday, September 27, Darlene worked all day at Ross-King-Walker Insurance Agency. Usually Darlene only worked three days a week at the insurance agency; however, due to the claims coming in from hurricane damage, Darlene and her boss worked overtime. That evening, Darlene was scheduled to also work at the Golden Turtle Lounge; however, she did not go in to work. According to McNeal, she went out that evening with one of her friends.
On Saturday morning, September 28, 1985, Darlene and McNeal worked together, cleaning up the house and yard. That afternoon, Darlene received a call from her good friend, Lisa Marie Brandenburg, a medical technician in the Air Force. Darlene met Lisa while in the Air Force. Lisa called Darlene to see if she wanted to go to the Seafood Festival in Biloxi. Darlene said that she really preferred to go to the Oktoberfest. Around 4:00 or 4:30 Saturday afternoon, Lisa picked up Darlene at the McNeal home; Lisa did not enter the home.
Accompanying the two women was Dan Christophel, Lisa's "roommate." The threesome went to Gulfport to the Oktoberfest. Finding little activity when they arrived, they returned to Biloxi to a seafood festival. While there, Darlene bought two feathers to wear in her hair.
At about 9:00 or 9:30 that evening, Dan, Lisa and Darlene returned to Lisa's and Dan's house. At that time, Lisa was waiting on a friend from Birmingham, Connie Smith, to arrive. Lisa asked Darlene to stay and meet this friend; however, Darlene said that she better get home. Then, Dan took Darlene home so that Lisa could wait on her friend to arrive. Dan was gone about 30 or 45 minutes. The trip from Lisa's house to Darlene's house was about a 20-minute drive. Dan dropped Darlene off at about 10:00 o'clock. This was the last time anyone other than McNeal saw Darlene alive.
At about 10:30, the same night, Saturday, September 28, Lisa called Darlene. Lisa's conversation on the telephone was in relation to a radar detector for her friend *154 Connie Smith. Lisa, knowing that McNeal was a policeman, believed that he would have known where to get a radar detector. According to Lisa, Darlene chatted easily and showed no signs of emotional upset.
McNeal confirmed the fact that his wife arrived at their home at 10:00 on Saturday night. McNeal was already in bed and the baby was already asleep. The conversation between Lisa and Darlene was also confirmed by McNeal. According to McNeal, after Darlene got off the phone, she came into the bedroom and said "Don, I'm going to my parents for the rest of the weekend." McNeal testified that Darlene changed clothes. She had been wearing a dark blue sweater and a pair of blue jeans. McNeal also related the fact that Darlene said that she was not taking one of the family cars.[1] Darlene said that she was riding with a friend to her parents' house. Supposedly, at this time, Darlene left for the weekend.
In the early morning hours of September 29, 1985, or Sunday, a neighbor across the street from the McNeals, Ann Minyard, was up with her sick six-month old baby. At around 1:00 or 2:00 a.m. in the morning, Mrs. Minyard heard car doors shut across the street. The McNeal home was the only house directly across the street from her residence. Mrs. Minyard's husband, Charles Minyard, had gone to a football game in New Orleans. He was due to arrive in at 4:00 a.m. Consequently, Mrs. Minyard knew that these car doors were not from her husband's automobile.
At around 4:00 a.m. Sunday morning, September 29, Mr. Minyard pulled into his driveway. At that same time, he observed a vehicle pull into the McNeal's driveway. He did not closely observe the person going into the McNeal's house.
Later that Sunday morning, Don got up, dressed, and fed April Dawn. Then, he began to paint the house. Shawn Darsey (hereinafter "Darsey"), McNeal's good friend, showed up according to plan, but Marvin Foster unexpectedly had to work and could not help them paint. The two men used the paint that McNeal had bought two days earlier at K-Mart. At trial it was not brought out whether Darsey was present when McNeal had the painting accident and Darsey did not testify in that regard.
While McNeal was painting, he was using a step-ladder in order to reach the wall trim. According to McNeal, he lost his balance and fell, knocking the paint can off with him. McNeal's contention was that the can landed upside down on the couch soaking it with paint and ruining it. McNeal's story was that he put the couch in the driveway, where it was soon picked up by scavengers.
Returning to the inside of the house, McNeal testified that he then tracked paint all over the living room carpet. Since the carpet had been damaged by the hurricane, McNeal decided to completely replace it. To save money, McNeal stated that he removed the carpet himself and burned it with other debris in the backyard.
McNeal and Darsey also did extensive work in the yard, hauling debris in the trunk of McNeal's 1969 Camero. Although the Camaro's paint job was generally in excellent condition, McNeal claimed that the trunk was beginning to show serious rusting. Supposedly at Darsey's suggestion, McNeal decided to paint the interior of the trunk on this day.
Around 1:00 p.m. that Sunday, Darsey got tired of working and left the McNeal home. At this time, McNeal decided to paint the kitchen and dining area. These projects went on to about 6:00 or 7:00 in the evening. Around 7:00 p.m., McNeal stopped work and rested for the remainder of the evening. McNeal testified that he did not become concerned that his wife had not returned because he believed she would return "sometimes early Monday morning."
The next day, Monday, September 30, 1985, McNeal decided to have the carpets in the house, except for the living room, professionally steam cleaned. McNeal called American Carpet Cleaning and Dye Company. *155 He informed the company that he was eager to have the carpets cleaned that day. When Ronnie Gardner and Bill Jackson, employees of American Carpet Cleaning and Dye Company, arrived on the scene, McNeal was in the garage on his hands and knees with a bucket and a brush scrubbing. Instead of allowing the workers to come through the garage, McNeal directed them through the front door. The men were directed to clean every room but the living room on account of the fact that the carpet had been pulled up and removed in this particular room.
While these repairs were going on, Azaline McCready, Darlene's boss at Ross-King-Walker Insurance, called as to Darlene's whereabouts. Monday was to be the insurance agents busiest day and Mrs. McCready had given Darlene explicit orders that she was to be there that day. McNeal informed Mrs. McCready that Darlene had spent the weekend at her parents' house and had not returned home. McNeal seemed puzzled that Darlene had not called Mrs. McCready.
That same morning, McNeal also telephoned Rhodes Carpet and Draperies. Julie Hebert, a design consultant with Rhodes Carpet received a call from McNeal at 8:15 on the morning of September 30, 1985. Mrs. Hebert testified that McNeal wanted the new carpet installed in the living room that day. Additionally, Mrs. Hebert claimed that McNeal did not ask about color or the price.
Later that afternoon, Mrs. Hebert went to McNeal's home to measure the living room. While at McNeal's house, she called in the measurements to her employer, Keith Rhodes. McNeal also talked to Keith Rhodes who informed him that the carpet could not be laid until Wednesday. At that time, McNeal also informed Hebert that he did not need an insurance estimate.
After Mrs. Hebert left, McNeal claimed that he began to get worried about his wife. He telephoned her parents in Bay St. Louis and asked to speak to her. His mother-in-law, Mrs. Audrey Collier, informed him that Darlene had not been there that weekend. Mrs. Collier testified that this was the longest conversation she had ever had with her son-in-law. This conversation took place between 5:30 and 6:00 p.m., Monday, September 30, 1985.
Following this phone call, Mrs. Collier as well as Darlene's brother, Thadis J. Collier, became worried and concerned about Darlene's safety. The next day, Tuesday, Mrs. Collier and T.J. Collier visited the McNeal home late in the afternoon. At that time, the carpet was off the living room floor and there was no furniture in the room. McNeal told Mrs. Collier that he was expecting Darlene any minute. However, T.J. Collier was less trusting of McNeal. T.J. made a thorough search of the house. Before leaving, Mrs. Collier and T.J. attempted to take April Dawn with them. However, McNeal said that she was fine there with him.
After the Colliers left, McNeal took April Dawn and went to the local Sheriff's Office to file a missing persons report. Darla J. Baker, the dispatcher with the Jackson County Sheriff's Office, testified that McNeal arrived at about 8:05 p.m. October 1, 1985. Baker filled out the paper work from the identification that McNeal gave him about Darlene. McNeal reported that his wife left the house about 10:00 p.m. on the 28th. Darla Baker testified that McNeal acted calm and friendly which was unusual. McNeal also volunteered that he was painting his house.
The next morning, Wednesday, October 2, 1985, Darlene McNeal's nude body was found a short distance from Interstate Highway 10, in St. Tammany Parish, Louisiana, just across the line from Mississippi. A man by the name of William Pounds, a resident of Mobile, Alabama, found the body by accident. Mr. Pounds was going to work on the morning of October 2. He was traveling to New Orleans to his employment as a deck mate on a boat. At about 8:00 or 9:00 a.m., on this particular morning, he crossed the Pearl River Bridge on I-10. Having a pressing need to relieve himself, he pulled off to a side road. While at this particular spot, he noticed a woman's body laying about 10 feet away. Pounds described the body as having black *156 hair and as laying face down. Pounds got back into his truck, drove to a rest area and called the local authorities. They responded and he took them back to the road and showed them the body.
The victim, unidentified as Darlene at first, had obviously died from a single gunshot wound to the head, producing both an entrance and exit hole. In the body's state of decomposition, the authorities were unable to determine whether she had been sexually assaulted. There was nothing left of her face but a skull.
On the same day, back in Ocean Springs, the local authorities headed by Detectives Polifrone and Krievel visited McNeal at his residence. The purpose of the visit was to gather additional information for McNeal's missing person report. While the officers were at McNeal's home, Lisa Brandenburg, Darlene's friend, dropped by the house. Upon seeing the empty living room, Lisa inquired about the missing couch and was informed of the painting accident. The officers also asked for recent photographs for Darlene. McNeal advised them that he had some photographs, but none were recent ones.
Thereafter, Lisa and the officers left McNeal's house. As the officers were driving away, Lisa pulled them over and tearfully asserted that McNeal was lying about the photographs and must be up to something. By Thursday, October 3, 1985, the body had been positively identified as that of Darlene McNeal. Sergeant Commander Roland Frey of St. Tammany Parish Sheriff's Office was able to obtain fingerprints from the corpse. These prints were delivered to Mr. Ron Smith of the Mississippi Highway Patrol who is a fingerprint examiner. Ron Smith, Supervisor of the Latent Fingerprint Section of the Mississippi Crime Laboratory, was qualified as an expert witness in the field of fingerprint identification. Mr. Smith compared the prints obtained by Officer Frey with Darlene's fingerprint identification card and to a set of prints contained in a fingerprint file of the Permit Division of the Mississippi State Tax Commission. Upon examination, Smith was able to positively identify the post-mortem prints as being those of Darlene McNeal.
With the positive identification of Darlene McNeal, the Jackson County Sheriff's Office notified Don McNeal that they had some information concerning his wife. When McNeal arrived at the Sheriff's Office, Detective Brooks told McNeal that they had found his wife and that she was dead. McNeal testified that he broke down and was unable to answer any questions. Officer Brooks on the other hand stated that McNeal just hung his head. Thereafter, at Detective Brooks' suggestion, McNeal and several officers adjourned to McNeal's residence where they thought he might feel better and answer questions.
The officers made a partial search of McNeal's house. McNeal gave the officers free reins to search everywhere. The officers asked McNeal questions concerning possible jewelry that Darlene might have been wearing as well as any clothes or makeup she might have taken with her.
Later that evening after the officers left, McNeal called his friend Shawn Darsey, and the two met for a drink. At this meeting, McNeal failed to mention to Darsey that his wife Darlene had been found dead.
On his return to the house, McNeal claimed that he began to realize that he was a suspect in the case. Fearful that he would be arrested and that April Dawn would be turned over the Youth Court, McNeal made a quick trip to West Virginia to leave his daughter with his own parents. After accomplishing this task, and making a short visit, McNeal returned to Ocean Springs. He drove straight through, arriving back at his home in Ocean Springs at 5:30 a.m. on Tuesday, October 8.
Upon entering his home after his trip, McNeal found that the residence had been completely searched by law enforcement officials. Search warrants were on the coffee table. Instead of contacting the officials immediately, McNeal simply turned off the lights and went to bed.
The following morning, Wednesday, October 9, 1985, McNeal arose at about 10:00 a.m. At this time, he picked up the search *157 warrants and headed out to get in his blue Camaro. On reaching his car, he was arrested by heavily armed law enforcement officials. The news media was also there to cover the story for a local television station. That same day, Wednesday, October 9, a second search was carried on at the McNeal residence. On this occasion a scrub brush as well as a gooey acid substance were found in the garage area. McNeal had openly left them there and they were seized.
McNeal was incarcerated in the Adult Detention Center in Pascagoula, Mississippi. Another prisoner named Freddie Suttles was confined in the same cellblock on an armed robbery charge. Suttles had a local newspaper subscription and avidly followed all the details of the McNeal investigation. Suttles claimed that McNeal confided in him while they were in the same cell block. On the other hand, McNeal claimed that Suttles derived pleasure from harassing McNeal with the details of Darlene's murder which he had picked up from the media. After three days of this, McNeal requested to be transferred and was accordingly moved to another part of the ADC.
As soon as McNeal was transferred to another part of the jail, Suttles, by his own testimony, immediately demanded to speak with law enforcement officials in order to make a deal. Suttles asserted that McNeal had admitted killing Darlene and told him all the details. Suttles claims that McNeal admitted shooting Darlene while she was on the couch in the living room of their house; that after killing her, he rolled the body off the couch onto the floor. He then quickly looked out the window to see if the shot had disturbed any of the neighbors. Seeing no lights on in the surrounding houses, McNeal told Suttles that he proceeded to cover up the crime. McNeal supposedly retrieved garbage bags from the kitchen that had been used earlier that day to clean up the hurricane debris. He then stripped the body and put it in the bag. From there, he put the wrapped body in the trunk of the Camaro and took it to Louisiana, where he disposed of it. These details were given by Suttles at the District Attorney's Office. Soon after his interview with someone in the District Attorney's Office, Suttles began to brag to at least two different prisoners that he would soon be released in exchange for testifying about the "ex-pig" Don McNeal. Whatever the substance of Suttles' boast, it is undisputed that his armed robbery charge was soon reduced to the much less serious charge of simple robbery.
Due to extensive press coverage, McNeal obtained a change of venue to the Circuit Court of Warren County, Mississippi. At trial, the court allowed into evidence nearly all the photographs of Darlene McNeal's decomposed face and body. Additionally, the tape recorded messages of McNeal's telephone conversations were played to the jury.
At the close of all the testimony, the court rejected all the defendant's proposed jury instructions concerning circumstantial evidence. One of the bases for this decision was the testimony of Freddie Suttles, which, the court felt, provided direct evidence of McNeal's guilt. The jury thereupon returned a verdict of guilty and Don McNeal was sentenced to life imprisonment. McNeal's motion for a new trial was denied and this appeal followed.

I. The Lower Court Erred in Refusing to Grant Defendant's Jury Instruction on Circumstantial Evidence.
In assignment of error number one, McNeal argues that the trial court was in error in not granting a jury instruction on circumstantial evidence. The current rule in this state is that this instruction must only be given where the prosecution can produce neither an eyewitness nor a confession to the offense charged. See Clark v. State, 503 So.2d 277 (Miss. 1987); Keys v. State, 478 So.2d 266, 267 (Miss. 1985).
The rule set out in Keys was recently modified to include unwritten verbal admissions made to any lay witness. In Mack v. State, 481 So.2d 793, 795 (Miss. 1985), we held:
The Reed Court [Reed v. State, 229 Miss. 440, 91 So.2d 269 (1956)] defined an admission as a statement by the accused  *158 it may be direct or implied  of facts pertinent to the issue and tendings in connection with other facts to prove his guilt [sic.: Mack mis-quotes Reed].... Direct evidence of the crime is the evidence of an eyewitness that it was committed. This includes in criminal law the confessions and admissions of the accused and dying declarations... .
In the case at bar, the trial judge relied heavily on Mack v. State, supra, in his decision not to grant McNeals' circumstantial evidence jury instruction. The trial judge found that Freddie Suttles, a convicted felon, provided direct evidence of McNeal's guilt. As stated in the facts, Suttles testified that McNeal freely admitted killing his wife, Darlene, as well as giving full details of the subsequent coverup.
Due to the uncertainty of Freddie Suttles' source for his facts (newspaper or McNeal), we strongly question the reliability of testimony which was given in exchange for a reduced sentence. The testimony of jail-house informants, or "snitches," is becoming an increasing problem in this state, as well as throughout the American criminal justice system. The present case is one of many across the nation where the truthfulness of the informant has been called into question. Informants, like Freddie Suttles, are offering evidence against their fellow inmates in exchange for reduced sentences. In the process of reaping their benefit, they are manipulating the system by helping to convict innocent citizens. See Curriden, "No Honor Among Thieves," ABA Journal, June 1989, at 51.[2]
The trustworthiness of such a witness has been addressed by this Court in the recent past. In Barnes v. State, 460 So.2d 126 (Miss. 1984), the main state witness against Barnes was Arthur Ray Moody. On appeal, Barnes assigned as error that the trial court unduly limited his inquiry into what may have motivated Moody to give testimony against Barnes. The state's case rested primarily on Moody's testimony. Moody believed that in exchange for his testimony, he would be "given help." This Court stated:
How the jury might regard Moody's credibility upon knowing that he had been promised some "help" on his case, on the one hand, and how the jury might react if it heard testimony that he had been promised immunity from prosecution altogether, on the other hand, are as a matter of commonsense so substantially different that the State's harmless error point is seen without merit. All of this is particularly true in view of the fact that Moody is the sort of witness whose testimony ought generally be viewed with caution and suspicion even in the absence of any proof of a leniency/immunity agreement.

Barnes, 460 So.2d at 132. The point in Barnes is that testimony of a state's witness who has received a reduced sentence *159 to testify should be regarded with caution and suspicion.
It is doubtful that such testimony should be considered as direct evidence which would prevent the granting of a circumstantial evidence instruction; however, we do not decide that question here, nor is it necessary, because we find merit and reverse under assignment of error number IV.

IV. The Lower Court Erred in Allowing Photographs of the Deceased's Body into Evidence.
At trial, the court admitted the gruesome and shocking photographs of Darlene McNeal's nude and partially decomposed body into evidence. McNeal's position is that these photographs aroused the passion and prejudice of the jury.
Having reviewed each of the photographs of Darlene McNeal taken at the scene of the crime, as well as those at the morgue, we are prone to agree that these photographs are so graphic as to arouse the passion of the jury. Without describing every morbid detail, it is sufficient to say that these are some of the most gruesome photographs ever presented to this Court.
The state's position is that all of the photographs were needed in order to prove the corpus delicti. See Sharp v. State, 446 So.2d 1008 (Miss. 1984). However, we believe that the state could have shown the angle and entry of the bullet wound without the full-color, close-up view of the decomposed, maggot-infested skull.
In McFee v. State, 511 So.2d 130 (Miss. 1987), we held:
Previously, this Court has held that the admissibility of photographs rests within the sound discretion of the trial judge, whose decision will be upheld absent abuse of that discretion... . Yet, photographs which are gruesome or inflammatory and lack an evidentiary purpose are always inadmissible as evidence. Cabello v. State, 471 So.2d 332, 341 (Miss. 1985); Billiot v. State, 454 So.2d 445, 449-60 (Miss. 1984).
Id. at 135. We find that exhibits 5, 13 and 15 are gruesome and lack any evidentiary purpose. Although the state argues that these photographs are relevant in proving the corpus delicti, we believe that the probative value of the photographs is outweighed by their tendency to inflame and prejudice the jury.[3]See Kniep v. State, 525 So.2d 385 (Miss. 1988). By virtue of the authority set out in McFee and Rule 403, M.R.E., this Court holds that the trial court abused its discretion and was in error in allowing the introduction of these photographs into evidence.
In arriving at the finding above, we do not presume to conclude that every gruesome photograph admitted into evidence constitutes an abuse of discretion; however, when presented with photographs such as the ones in this case, we caution the trial judge to carefully consider all the facts and circumstances surrounding the admission of this particular type of evidence. More specifically, the trial court must consider: (1) whether the proof is absolute or in doubt as to identity of the guilty party, as well as, (2) whether the photographs are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury.

CONCLUSION
This Court finds error in the trial court's admission of the highly inflammatory and prejudicial photographs of the deceased, Darlene McNeal. We are aware of the fact that prosecutors, "in their often over-zealous efforts to obtain a criminal conviction, seek the introduction of inordinately gruesome photographs where the photographs have little, if any, probative value." See Shearer v. State, 423 So.2d 824 (Miss. 1982). The pictures in this case, having little probative *160 value, served only to inflame the passion and prejudice of the jury.
Additionally, we reiterate that the proof in this case is primarily, if not completely, based on circumstantial evidence. The inclusion of the cellmate's testimony, along with the admission of life-size, colored photographs, only serves to support our position that Donald Eugene McNeal did not receive a "tolerably fair trial regardless of the nature of his offense... ." See Hosford v. State, 525 So.2d 789 (Miss. 1988), and Rule 103(a), Mississippi Rules of Evidence. Therefore, it cannot be said that the admission of the photographs did not substantially adversely affect McNeal's right to a fair trial. Rule 103(a), M.R.E.
Accordingly, the judgment of the Circuit Court of Warren County, Mississippi, dated June 6, 1986, is hereby reversed and vacated and the case is remanded for a new trial or other disposition not inconsistent with this opinion.
REVERSED AND REMANDED.
HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN and BLASS, JJ., concur.
ROY NOBLE LEE, C.J., dissents with separate written opinion, joined by ANDERSON, J.
ANDERSON, J., dissents with separate written opinion, joined by ROY NOBLE LEE, C.J.
PITTMAN, J., not participating.
ROY NOBLE LEE, Chief Justice, dissenting:
The State's evidence against Donald Eugene McNeal was circumstantial, but it overwhelmingly proved his guilt beyond reasonable doubt. The majority opinion reverses the conviction, stating that three photographs were gruesome, inflammatory and prejudicial. Unless there has been a clear abuse of discretion on the part of the trial judge, this Court will not reverse on such ground.
The body of Darlene McNeal was discovered lying face down in the woods. Her face was decomposed and maggots had eaten away the flesh, leaving the skull and face bare. However, the photos had probative value in depicting the entry point of the missile, which caused her death. It was a large jagged hole at the left rear of the skull (head). The potential murder weapon was found in the possession of McNeal. The physical evidence reflected in the photographs was an extremely important circumstance in the case and had real evidentiary value.
As for being gruesome, the photos here cannot compare with many other cases affirmed by this Court on the question, e.g., photos of the victim with part of the head blown off, brains scattered on the floor and walls, fresh blood all over and around the scene. Comparing such cases with this one, the photos here are mild.
The writer has been a member of this Court for fourteen years. During that time, although many cases involving the question of gruesome photographs have been before the Court, none have been reversed for that ground. See Hunt v. State, 538 So.2d 422 (Miss. 1989) (dead body and blood on the concrete driveway); Pinkney v. State, 538 So.2d 329, 347 (Miss. 1988) (victim's body); Minnick v. State, 551 So.2d 77, 83 (Miss. 1988) (dead bodies); Lanier v. State, 533 So.2d 473, 483-84 (Miss. 1988) (body at crime scene); Jackson v. State, 527 So.2d 654, 657 (Miss. 1988) (victim's body); Boyd v. State, 523 So.2d 1037, 1040 (Miss. 1988) (morgue photos, crime scene photos); Kniep v. State, 525 So.2d 385, 387 (Miss. 1988) (victim's body photographed at hospital); Williams v. State, 544 So.2d 782, 784 (Miss. 1987) (victim's heart and larynx separated from the body, upper portions of victim's body at autopsy, body as found at scene of murder, close-up view of the chest area at autopsy, enlarged close-up views of wound to the genital area); Sims v. State, 512 So.2d 1256, 1258 (Miss. 1987) (victim's bruised head, face and arm not "gruesome"); McFee v. State, 511 So.2d 130, 134-35 (Miss. 1987) (lower portion of victim's body clad in blood-stained pajama pants torn to expose pubic area); Koch v. State, 506 So.2d 269, 271 (Miss. 1987) (enlargements to show powder burns *161 on victim's body); Griffin v. State, 504 So.2d 186, 192 (Miss. 1987) (crime scene with two bodies); Simpson v. State, 497 So.2d 424, 433 (Miss. 1986) (photographs of victim not gruesome); Cooley v. State, 495 So.2d 1362, 1364 (Miss. 1986) (victim's leg wound); Parker v. State, 514 So.2d 767, 771 (Miss. 1986) (victim as rescuers attempted to cut clothing from his body after fire); Wiley v. State, 484 So.2d 339, 346 (Miss. 1986) (body and blood); Watson v. State, 483 So.2d 1326, 1328 (Miss. 1986) (child's injuries); Luvene v. State, 481 So.2d 323, 325 (Miss. 1985) (four photographs of rape victim's face); Johnson v. State, 476 So.2d 1195, 1206 (Miss. 1985) (photographs of victim to show cause of death and extent of wounds not gruesome); Swanier v. State, 473 So.2d 180, 185 (Miss. 1985) (victim's body to show severity of wounds); Trapp v. Cayson, 471 So.2d 375, 380 (Miss. 1985) (film showing attaching catheter for urination, bowel evacuation procedures, etc.); Cabello v. State, 471 So.2d 332, 341-42 (Miss. 1985) (body on autopsy table to show how tape had covered nose, how rope had crushed larynx, how tightly wrists and ankles had been bound, livor on dependent side); Kelly v. State, 463 So.2d 1070, 1074 (Miss. 1985) (color photos of victim and crime scene to show location of wound); Cardwell v. State, 461 So.2d 754, 760 (Miss. 1984) (photos of deceased child to show location and multiplicity of wounds and extent and force of violence used); Roberts v. State, 458 So.2d 719, 722 (Miss. 1984); Gardner v. State, 455 So.2d 796, 800 (Miss. 1984) (crime scene); Lewis v. State, 454 So.2d 1306, 1307 (Miss. 1984) (photo showing position of body); Holliday v. State, 455 So.2d 750, 752 (Miss. 1984) (slides showing entry wound and bullet hole in the wall); Dufour v. State, 453 So.2d 337, 345 (Miss. 1984) (bodies of victims showing entrance wounds by knife and screwdriver); Billiot v. State, 454 So.2d 445, 460 (Miss. 1984) (photo of victim to establish corpus delicti); Collins v. State, 447 So.2d 645, 646 (Miss. 1984) (photo of victim to show the degree of decomposition consistent with testimony as to time of death and what the victim was wearing when last seen); Booker v. State, 449 So.2d 209, 216 (Miss. 1984) (graphic photos of victim's condition after shooting); Sharp v. State, 446 So.2d 1008, 1009 (Miss. 1984) (photograph of victim to establish circumstances of the killing, corpus delicti and position of body); Groseclose v. State, 440 So.2d 297, 301 (Miss. 1983) (victim's body at time officers arrived not inordinately gruesome); Hubbard v. State, 437 So.2d 430, 436 (Miss. 1983) (to show posture of victim at time he was shot); Robinson v. State, 434 So.2d 206, 208 (Miss. 1983) (color slides depicting victim's fatal wounds); Palmer v. State, 427 So.2d 111, 116 (Miss. 1983) (photographs showing brutal beating to murder victim's face to show victim not accidentally killed); Gilliard v. State, 428 So.2d 576, 581 (Miss. 1983) (photo of victim's arm and body with considerable amount of blood to show cruelty and atrocity of crime and to show position and distance connected with discharge of gun); Shearer v. State, 423 So.2d 824, 826 (Miss. 1982) (gruesome photographs of decedent's wounds not devoid of probative value); Smith v. State, 419 So.2d 563, 567 (Miss. 1982) (photographic slides of victim projected on screen during closing argument not inordinately gruesome and had probative value as to nature of wounds and whether offense was especially heinous, atrocious or cruel); and Edwards v. State, 413 So.2d 1007, 1011 (Miss. 1982) (black and white photos depicting single bullet wound not gruesome).[1]
The majority opinion cites McFee v. State, 511 So.2d 130 (Miss. 1987), as authority for its position. However, it neglects to state the McFee Court denied the contention that admitting the photos was error and affirmed the conviction.
A former Justice of this Court once said, "If the photo has any probative value at all, why should the defendant be in a position *162 to complain  he caused the condition of the poor victim."
I dissent.
ANDERSON, J., concurs with this dissent.
ANDERSON, Justice, dissenting:
Today the Court plows new ground by reversing a case on the basis of gruesome photographs. Never before have we reversed a case because photographs were too gruesome. We have always held that the admission of photographs is within the sound discretion of the trial court. We did not reverse on this issue, even when we found that a photograph of the deceased taken as he lay on the ground after being killed by the appellant was not relevant, of no value to the jury, and should not have been admitted into evidence. Coleman v. State, 67 So.2d 304 (Miss. 1953). See also, West v. State, 67 So.2d 366, 371 (Miss. 1953). Therefore, I would affirm the conviction and sentence of the defendant, even though the photographs are gruesome and depict a graphic description of what he caused.
ROY NOBLE LEE, C.J., joins in this dissent.
NOTES
[1] The McNeals owned three automobiles, a Corvette, a blue Camero, and a Pinto. According to Don McNeal, the Camero and Pinto were not in good running order.
[2] In a recent ABA Journal entitled "No Honor Among Thieves," Mark Curriden, a Chattanooga, Tennessee reporter, reviewed the problems surrounding the jail-house "snitches'" testimony. The article centered on several recent cases in which false testimony of informants has nearly led to an execution. (Take special note of the case involving James Richardson who was convicted of murdering his seven children.)

One of the several people interviewed by Curriden was Curt Livesay, the chief assistant district attorney for Los Angeles County. Before approving an informant's testimony for trial, Livesay uses a check list of questions in confirming the reliability of the informant's testimony. Livesay says:
Before we use an informant, we ask, "How is it that the informant could have learned this information without actually talking to the person he says he talked to? Was the informant ever housed in the county jail with the defendant? Was he ever transported on a bus with the defendant? Is it possible the informant could have gotten police reports and got the information from that? Is there any other way he could have gotten that information?" We look for all these red flags.
Failing to follow a procedure as set out by Livesay results in what Leslie Abramson, president of the California Attorneys for Criminal Justice coined:
[A]n unholy alliance between con-artist convicts who want to get out of their own cases, law enforcement who's running a training ground for snitches over at the county jail, and the prosecutors who are taking what appears to be the easy route, rather than really putting their cases together with solid evidence.
[3] Under Rule 403 of the Mississippi Rules of Evidence, we find that "the probative value of these photographs is substantially outweighed by the danger of unfair prejudice." Although the state makes the point that these photographs are relevant in proving the corpus delicti, we cannot ignore the possibility that the inflammatory nature of these photographs unduly prejudiced the jury against McNeal.
[1] In addition to the cases listed, at least thirty (30) more cases have been handed down by this Court since 1950 allowing convictions to stand where photographs, challenged as "gruesome" and "inflammatory," have been entered into evidence.