ROBERTS, J.,
for the court:
¶ 1. Following a three-day trial in the Pike County Circuit Court, LeDarius Bonds was convicted of murder. The circuit court sentenced Bonds to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC). Feeling aggrieved, Bonds appeals and claims that the circuit court erred in allowing the State to introduce gruesome photos of the victim that were more prejudicial than probative. Additionally, Bonds claims that the jury received an improper jury instruction. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. LaJeremy Seabron went missing on August 27, 2010, after giving Bonds, his coworker at the Sanderson Farms plant, a ride after work. After Seabron went missing, the police department received a call from Bonds, who told them that he was being threatened at work by Seabron’s friends about Seabron’s disappearance. Bonds initially told police that he did receive a ride home from Seabron, but he had not seen Seabron since then. On September 1, 2010, a burned vehicle registered to Seabron’s mother was discovered. The following day, Seabron’s decomposing body was discovered several miles away from the burned vehicle. An autopsy showed that Seabron died from a single gunshot wound to the back of the head.
¶ 3. On September 3, 2010, investigators interviewed Bonds. During this interview, Bonds told the investigators that Seabron *1005 was a member of a local gang. Bonds had repeatedly declined Seabron’s invitations to join the gang, which according to Bonds, resulted in Seabron threatening to kill Bonds and calling him a snitch. Bonds further told the investigators that the men had worked out their differences. Bonds admitted that Seabron had given him a ride home after work on August 27, 2010, but Bonds stated that he had not seen him since that time, even though Seabron had planned to return to Bonds’s apartment.
¶ 4. After investigators questioned this version of events, Bonds then told another version involving another car stopping them on the way home from work. The individuals in the other car took Seabron at gunpoint and threatened to kill Bonds or someone in his family. Bonds again changed his story. In this next version, Seabron pulled over on the roadside and told Bonds he wanted him to see something. According to Bonds, Seabron then approached him from behind and cocked a gun. A struggle ensued, and the gun discharged. Bonds was able to gain possession of the gun and shot Seabron in the back of the head. He then told investigators that he left Seabron in the automobile, but came back a day or two later to remove Seabron’s body and move and burn the automobile. This portion of the story again changed to Bonds leaving Seabron on the ground after shooting him, driving the automobile away, hiding the gun, and then burning the automobile at another location. Bonds also led investigators to Seabron’s gun, which he claimed he hid in a vacant house after the incident. The gun, with a pearl-like handle, was recovered in the vacant house, and it had one spent shell casing and five live rounds. No fingerprints or ballistic data was able to be obtained from the gun or the bullet fragments recovered from Seabron’s skull.
¶ 5. Several days later, Bonds requested to speak to investigators yet again. He changed his version of the events again. This time, Bonds stated that during the struggle, he was able to force Seabron’s arm behind his back. This position put Seabron’s hand holding the gun facing toward the back of Seabron’s head. The gun discharged, shooting Seabron in the back of the head.
¶ 6. Bonds was indicted by a Pike County grand jury on May 5, 2011, for the murder of Seabron in violation of Mississippi Code Annotated section 97-3-19 (Rev.2006). His jury trial began on April 3, 2012, and ended on April 5, 2012, with the jury finding him guilty of the murder of Seabron. In addition to Bonds’s statements he made to the investigators, the jury heard testimony from several witnesses, including Bonds’s roommate at the time, Brandon Hall. Hall testified that he usually gave Bonds rides to and from work; however, on August 27, 2010, Bonds told him he did not need a ride home from work that day because Seabron was going to give him a ride home. Hall also testified that when Bonds came home later that day, Bonds asked him to tell people that the last time he saw Bonds and Seabron together was at 4:30 p.m. on August 27, 2010. This was an untrue statement. According to Hall’s testimony, Bonds told him that he had dumped Seabron’s body and burned the car. Lastly, Hall testified that Bonds moved out of their apartment shortly after Seabron went missing. As Bonds was moving out, Hall said he had seen Bonds throw a gun over a fence near their apartment, and he had also seen a gun with a pearl-like handle in Bonds’s room a few days before Seabron went missing.
¶ 7. In addition, the State presented the jury with several crime-scene photographs depicting the decomposing body of Sea- *1006 bron. Bonds’s attorney objected to the introduction of the photographs. The circuit court overruled the objection and allowed several pictures into evidence; however, it also sustained the objection as to some pictures prohibiting their introduction into evidence.
¶ 8. After deliberations, the jury found Bonds guilty of the murder of Seabron. The circuit court sentenced Bonds to life in the custody of the MDOC. Bonds timely executed the current appeal. On appeal, he raises the following two issues:
I. Whether the [circuit] court erred ■ by allowing introduction of gruesome photographs which were more prejudicial than probative?
II. [Whether it was] error to instruct the jury on the deadly weapon inference of deliberate design?
STANDARD OF REVIEW
¶ 9. In regard to the admission or exclusion of evidence, the standard of review is abuse of discretion. Grim v. State, 102 So.3d 1073, 1078 (¶ 11) (Miss.2012) (citing Williams v. State, 991 So.2d 593, 597 (¶ 8) (Miss.2008)). The standard of review for the circuit court’s decision to refuse or give jury instructions is also the abuse-of-discretion standard. Bailey v. State, 78 So.3d 308, 315 (¶ 20) (Miss.2012) (citing Newell v. State, 49 So.3d 66, 73 (¶ 20) (Miss.2010)). The jury instructions given must be read as a whole to determine if the circuit court abused its discretion. Reid v. State, 910 So.2d 615, 623 (¶ 23) (Miss.Ct.App.2005) (citing Conners v. State, 822 So.2d 290, 292 (¶ 5) (Miss.Ct.App.2001)). When read as a whole, “if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found.” Id. (quoting Conners, 822 So.2d at 292 (¶ 5)).
ANALYSIS
I. ADMISSION OF GRUESOME PHOTOGRAPHS
¶ 10. Bonds claims that the circuit court abused its discretion in allowing certain photographs depicting the decomposing body and head of Seabron to be admitted into evidence. Bonds contemporaneously objected to the introduction of the photographs as being gruesome and lacking probative value. The circuit court, outside of the jury’s presence, heard arguments from the State and Bonds about the admissibility of each photograph. Still outside the jury’s presence, Bonds offered to stipulate to Seabron’s cause of death being a gunshot wound to the back of the head. The State explained the reasons it would use each photograph, including to show the location of the body, the injuries to the body, and to support the testimony of its witnesses. The circuit court admitted several photographs into evidence and provided corresponding reasons for their admission. The circuit court also specifically noted that it did not find that the photographs were “unduly prejudicial or unnecessarily gruesome or inflammatory.” It further cautioned the State to use the photographs for their intended purpose and not to inflame the jury.
¶ 11. While Bonds claims that he stipulated to the death of Seabron and the cause of death, this stipulation was done outside of the jury’s presence, and the jury was never instructed as to the stipulation. Therefore, the burden remained on the State to prove all of the elements of the crime. As such, the State was entitled to present evidence and testimony as to Sea-bron’s cause of death.
¶ 12. Admittedly, the photographs of Seabron’s decomposing body and head surrounded by maggots certainly are not pleasant, but “[o]nly some probative *1007 value is needed to support a [circuit court’s] admission of a gruesome photograph.” King v. State, 83 So.3d 376, 378 (¶ 7) (Miss.2012) (citing Chamberlin v. State, 989 So.2d 320, 340 (¶73) (Miss.2008)). In Posey v. State, 822 So.2d 315, 318 (¶ 12) (Miss.Ct.App.2002), the circuit court reviewed the photographs and weighed the probative value against its potential prejudice. It deemed that the photographs were necessary to corroborate the testimony of the witnesses and were not meant to arouse the passion and prejudice of the jury. Id. Conversely, in McNeal v. State, 551 So.2d 151, 159 (Miss.1989), the Mississippi Supreme Court reversed Donald McNeal’s murder conviction based on gruesome photographs of a decomposing body surrounded by maggots. The supreme court found that the State could have used alternative, pictures to show the wound; thus, the probative value was outweighed by the prejudicial effect. Id.
¶ 13. While the photographs in McNeal may be more similar to the photographs in the current case, we find that the Posey court provides the proper resolution in the present case. The circuit court thoroughly considered the admission of the photographs, specifically considering the prejudicial effect on Bonds. It reviewed each photograph, excluding some due to cumu-lativeness and gruesomeness, and admitted certain less gruesome photographs to allow the State to present its theory of the case. The State explained that it picked certain photographs because most of the others “showed [Seabron’s] members, which would have been his arms and legs, which [had] been eaten away by insects and other scavengers.” The admittéd photographs did have evidentiary value. For example, the photograph showing the precise bullet entry point to the back of the skull is very relevant as it related to one of Bonds’s statements that Seabron accidentally shot himself in the back of the head during a struggle over the gun. The circuit court carefully considered each photograph, excluding some that were less probative due to the fact that the same injury was shown more clearly in other less gruesome photographs. Further, we do not find from the record that the photographs were used for the primary purpose of inflaming the jury. Therefore, we find that the circuit court did not abuse its discretion in allowing the photographs to be admitted into evidence.
II. JURY INSTRUCTION
¶ 14. Bonds next argues that the circuit court erred in giving the jury an instruction that it could infer malice aforethought from the use of a deadly weapon. He alleges that this instruction was essentially a peremptory instruction on malice, and it compelled the jury to return a verdict of murder as opposed to allowing the jury to consider the self-defense and manslaughter instructions also given.
¶ 15. The jury received numerous instructions and was specifically instructed to not “single out any one instruction alone as stating the law, but [it] should consider [the] instructions as a whole.” The jury was instructed as to the definition of, elements of, and differences between murder, manslaughter, and self-defense. At issue, according to Bonds, is jury instruction 9, which states: “If death is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, then malice may be inferred from the use of the weapon.” Bonds contends that this instruction was in conflict with jury instruction 17, which states, in pertinent part: “The [circuit c]ourt [instructs] the jury that ‘Manslaughter’ is ‘the killing of a human being, without malice or deliberate design in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon without authority of law, and not in neces *1008 sary self-defense.”[1] Bonds alleges that the reading of jury instruction 17 with jury instruction 9 left the jury confused and with no other option but to find Bonds guilty of murder since malice may be inferred by the use of a deadly weapon.
¶ 16. We find two recent decisions that address the issue raised by Bonds. In Reith v. State, 135 So.3d 892, 897 (¶ 11) (Miss.Ct.App.2013) (rehearing pending), the jury received an instruction that said in part: “Deliberate design may be presumed from the unlawful and deliberate use of a deadly weapon.” Joseph Reith claimed this instruction was an incorrect statement of the law. This Court found that while the jury should not have been instructed that deliberate design may be presumed since the circumstances surrounding the use of the weapons had been established, the error was harmless error. Id. at 898 (¶ 17). This Court further found that the jury was fully and fairly instructed of the State’s burden of proof by other instructions. Id. at 899 (¶ 18). Most recently, in Williams v. State, 111 So.3d 620, 626 (¶¶ 19-21) (Miss.2013), the supreme court looked at the specific language in a similar jury instruction and found that the instruction was harmless error.[2] In Williams, the jury received an instruction that stated: “ ‘Deliberate design’ may be inferred through the intentional use of any instrument which based on its manner of use is calculated to produce death or serious bodily injury.” Id. at 623 (¶ 8). The supreme court stated that the “may be inferred” language in the instruction allowed “the jury the discretion to reach a conclusion only if evidence [had] been presented to support that conclusion, thus creating a true permissive inference.” Id. at 626 (¶ 19) (citing Francis v. Franklin, 471 U.S. 307, 314, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985)). Because the instruction did not create a mandatory presumption, there was not an impermissible shift of the burden of proof. Id.
¶ 17. In the present case, the instruction provided to the jury stated that malice may be inferred by the use of a deadly weapon. Thus, just as in Williams, the jury was permitted to consider all the evidence and determine if it was sufficient to support the conclusion. Just as in Reith, the jury in this case was instructed as to the elements of murder, manslaughter, and self-defense, and it was told that it had to determine whether the State satisfied its burden by proving each element of the crime, including deliberate design or malice, beyond a reasonable doubt.[3] An appellate court will not reverse a conviction even when an error has occurred if the overwhelming weight of the evidence supported the guilty verdict, and “the jury was fully and fairly instructed by other instructions.” Kolberg v. State, 829 So.2d 29, 49 (¶¶ 37-38) (Miss.2002) (citations omitted). We find that any possible error the jury instruction may have caused was harmless at best; therefore, we find this issue to be without merit.
¶ 18. Once again, we are concerned with the quality of the State’s brief. Its full statement of facts is as follows: *1009 “[Bonds] took a gun and shot [Seabron] in the back of the head. [Bonds] took the body and burned [Seabron]’s car. [Bonds] gave several statements to police which ultimately led to admitting his involvement in [Seabron’s] death.” While Mississippi Rule of Appellate Procedure 28(b) gives the State discretion in providing a thorough statement of the case even if it is satisfied with the appellant’s version, it does not allow such discretion in respect to requiring the appellee to state the precise relief sought in its brief. The State’s conclusion states in full: “Based upon the arguments presented herein as supported by the record on appealf,] the State would ask this reviewing court to affirm the trial court order denying relief, revoking the post-release supervision and imposing the remaining of the suspended sentences.” This last paragraph causes confusion since there was no post-release supervision or suspended sentence involved in the present case. We expect better.
¶ 19. Even with the errors and shortcomings in the State’s brief, we detect no error, and we affirm Bonds’s conviction and sentence.
¶ 20. THE JUDGMENT OF THE PIKE COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PIKE COUNTY.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.

. Deliberate design and malice aforethought are synonymous. Jones v. State, 710 So.2d 870, 877 (¶ 30) (Miss.1998) (citations omitted).

. The supreme court ultimately reversed and remanded the case for a new trial based upon a jury instruction that created a mandatory presumption. Williams, 111 So.3d at 626 (¶ 21).

.We have been unable to find any Mississippi case where the jury instruction that the jury may infer malice by the use of a deadly weapon creates a mandatory presumption of malice thereby impermissibly shifting the burden of proof from the State to the defendant.