## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 1998-KA-01023-SCT

*ABDULLA WHITTINGTON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/07/1998 |
| TRIAL JUDGE: | HON. MIKE SMITH |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | NANCY GUY ARMSTRONG |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEAN SMITH VAUGHAN |
| DISTRICT ATTORNEY: | DUNN O. LAMPTON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/07/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/28/99 |

## BEFORE PITTMAN, P.J., McRAE AND SMITH, JJ.

## PITTMAN, PRESIDING JUSTICE, FOR THE COURT:

### STATEMENT OF THE CASE

¶1. This is a criminal appeal from the Circuit Court of Pike County, Mississippi. In January, 1998, Abdullah Whittington was indicted for the murder of Timothy Hodges. Whittington rejected a plea bargain for the crime of manslaughter and was subsequently tried and found guilty of murder. Whittington was sentenced to serve a life sentence in the Mississippi Department of Corrections.

¶2. Whittington filed a motion for a j.n.o.v., or in the alternative, a new trial, which was denied by the trial court. From this denial, Whittington timely perfected an appeal to this Court. He seeks as relief a reversal of his conviction and sentence and a remand to the circuit court for a new trial.

### STATEMENT OF FACTS

¶3. On the morning of December 2, 1997, at approximately 1:40 a.m., the police were called to the Community Park Apartments in McComb, Mississippi, to respond to a shooting. When Detective Perry Ashley ("Ashley"), the investigating officer, arrived on the scene, he saw a green Honda Accord in the parking lot. The passenger side door was open, and the victim, Timothy Hodges ("Hodges"), was lying in the street. Emergency personnel had covered Hodges with a sheet.

¶4. Upon examining the scene, Ashley discovered that the keys were still in the ignition of Hodges' car. Ashley located a car across the street that appeared to have a bullet hole in the windshield. This car,

however, was not involved in the crime. No gun or other weapon was found at the scene or in Hodges' car.

¶5. Ashley photographed the crime scene and began looking for witnesses. He talked with members of Hodges' family who were on the scene but who were not present at the time of the murder. Ashley then talked to Emily Lacking ("Lacking") and, based upon that conversation, instructed the uniformed officers to go to Whittington's home and arrest him for Hodges' murder.

¶6. Whittington's home was only two blocks from the murder scene. When the officers arrived at the home at approximately 2:40 a.m., Whittington's mother, Mrs. Jean Whittington ("Mrs. Whittington"), answered the door. Mrs. Whittington told the officers that Whittington was washing dishes. Whittington was called to the door and arrested.

¶7. A cursory search was done of the home with Mrs. Whittington's permission. A thorough search was done later that morning at approximately 10:00 a.m. No gun was ever found in the home.

¶8. Ashley testified that no test was done on Whittington's hands to detect the presence of gunshot residue. He explained that because Whittington was washing dishes when arrested, there would be no residue left on his hands. He also explained that Whittington's clothes had not been tested for gunshot residue because the crime lab had little, if no, success finding residue on clothes.

¶9. Lacking testified that she heard gunshots and saw Whittington sometime around 1:30 a.m. on December 2, 1997. She testified that she saw Whittington, who was dressed in black, coming from the vicinity of the Community Park Apartments waiving a gun in the air. Lacking stated that Whittington was yelling obscenities and asking who would testify against him. Whittington then went toward his house, and his mother came to the sidewalk to meet him.

¶10. Stephen Brown ("Brown") testified that on the night of the murder he was waiting in his apartment for his girlfriend to arrive home so that he could leave for work. The building that Brown lived in was the building in front of which Hodges' car was parked. Brown testified that he heard a car and looked out the window. Brown saw Hodges get out of the car and walk into the building.

¶11. Brown stated that a few minutes later he saw Whittington walk up behind Hodges. Hodges apparently tried to shake off Whittington. He then saw Whittington pull a gun, shoot Hodges, and kick him in the face. Whittington then walked up the hill, waiving his gun and yelling obscenities about who would testify against him. Brown testified that he had no doubt in his mind that Whittington was the man who killed Hodges.

¶12. Jacque White ("White") was in the car with Hodges when he arrived at the Community Park Apartments. White saw Whittington approach Hodges and then shoot him. White testified that he was approximately six feet from Hodges when he was shot. Later the same morning, White was asked to view a photo lineup and see if he could identify one of the subjects as the one who killed Hodges. After viewing the photographs, White was unable to positively identify Whittington. However, later that day, White was able to identify Whittington from a physical lineup.

¶13. Dr. Stephen Hayne testified that Hodges had two gunshot wounds. The first wound was a nonlethal wound in his arm. He testified that there was gunshot residue in the wound indicating that the muzzle of the gun was touching Hodges' skin when the shot was fired. The lethal gunshot was one that entered Hodges' mouth and injured his brain.

¶14. Whittington offered only two witnesses on his behalf: his mother, Jean Whittington, and his best friend, Roger Johnson. Johnson testified that he was with Whittington the night of the murder until 12:30 or 1:00 a.m. On cross-examination, it was brought out that Johnson had earlier told the prosecution that he dropped Whittington off at his home at 12:30 a.m.

¶15. Mrs. Whittington testified that her son arrived home between 1:00 and 1:30 a.m. On cross-examination by the State, Mrs. Whittington denied telling the officer who arrested Whittington that her son had been home less than one hour when the police arrived at her home at 2:40. Mrs. Whittington further testified that her son had finished washing the dishes when the police arrived.

¶16. The state called one rebuttal witness, Officer David Elson ("Elson"). Elson testified that when he arrived at the Whittington home at 2:40 a.m., Mrs. Whittington told him that her son had been home less than one hour. Elson also testified, in direct contravention to Mrs. Whittington's testimony, that Whittington was still washing dishes when they arrived.

¶17. The jury found Whittington guilty of murder. The judge then sentenced him to life in prison.

## STATEMENT OF THE ISSUES

**I. WHETHER THE TRIAL COURT ERRED IN ALLOWING DETECTIVE PERRY ASHLEY TO REMAIN IN THE COURTROOM THROUGHOUT THE TRIAL AND ALSO TESTIFY IN THE CAUSE.**

**II. WHETHER THE TRIAL COURT ERRED IN REFUSING THE DEFENDANT'S JURY INSTRUCTION 6.**

**III. WHETHER THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE PHOTOGRAPHS OF THE VICTIM WITH GUNSHOT WOUNDS TO HIS HEAD AND ARM.**

**IV. WHETHER THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.**

**V. WHETHER JUSTICE WOULD BE BEST SERVED BY THE SETTING ASIDE OF THE VERDICT OF THE JURY AND THE ENTRY OF A VERDICT OF NOT GUILTY OR THE GRANTING OF A NEW TRIAL.**

## DISCUSSION OF LAW

**I. WHETHER THE TRIAL COURT ERRED IN ALLOWING DETECTIVE PERRY ASHLEY TO REMAIN IN THE COURTROOM THROUGHOUT THE TRIAL AND ALSO TESTIFY IN THE CAUSE.**

¶18. Whittington maintains that he was prejudiced by the trial court when it allowed Ashley to remain in the courtroom throughout the trial and also testify in the cause. He maintains that this was a violation of M.R.E. 615.

**Standard of Review**

¶19. It is well settled in Mississippi jurisprudence that when a violation of Rule 615 is alleged on appeal, this Court is limited to an abuse of discretion standard of review. ***Douglas v. State***, 525 So.2d 1312, 1318 (Miss. 1988). Reversal is not justified unless there is a showing of prejudice sufficient to constitute abuse of discretion on the part of the trial judge in not ordering a mistrial or not excluding testimony. Id.

## Discussion

¶20. Rule 615 of the Mississippi Rules of Evidence states:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause.

¶21. At the beginning of the trial, the State asked that Ashley be allowed to remain in the courtroom during the testimony of the other witnesses. The State maintained that because Ashley was the case agent, he should be allowed to sit in the courtroom and assist the State in its presentation of the case. The trial judge ruled that Ashley qualified as a representative of the State under the Rule. Given the language of subpart (2) of Rule 615, the trial court did not abuse its discretion in allowing Ashley to remain in the courtroom.

¶22. Whittington has raised no specific ways in which he was prejudiced by Ashley being allowed to remain in the courtroom. He has made the blanket assertion that ". . . Ashley's presence in the courtroom while others testified was not essential to the presentation of the state's case and the court erred in allowing [him] to be [present] while others testified and then to testify himself." Whittington is in error when he asserts that Ashley was present while others testified and then later testified himself. Ashley was the first witness called in the case. He testified before any other witness was called. Because Rule 615 had been invoked regarding all other witnesses, no other witness was in the courtroom at the time Ashley testified.

¶23. There was no prejudice to Whittington in allowing Ashley to remain in the courtroom. The comment to Rule 615 states that "[t]he excluding or sequestering [of] witnesses has long been recognized as a means of discouraging and exposing falsification, inaccuracy, and collusion."

¶24. In this instance, Whittington can show no falsification, inaccuracy, or collusion on the part of Ashley. Whittington can show no collusion between Ashley, the first witness to testify, and the other witnesses as a result of the violation of Rule 615. Nor can Whittington show any falsification or inaccuracy on the part of Ashley. Accordingly, this issue is without merit.

### II. WHETHER THE TRIAL COURT ERRED IN REFUSING THE DEFENDANT'S JURY INSTRUCTION 6.

¶25. Whittington argues that the trial court erred in refusing to grant jury instruction D6. The trial court found the instruction cumulative and refused to grant the instruction.

¶26. However, Whittington made only a general objection that the instruction was an improper jury instruction. This Court stated in ***Oates v. State*** that "[e]rrors based on the granting of an instruction will not be considered on appeal unless specific objections stating the grounds are made in the trial court. ***Collins v. State***, 368 So.2d 212 (Miss. 1979); Miss.Sup.Ct. Rule 42." ***Oates v. State***, 421 So.2d 1025, 1030

(Miss. 1982). Because no specific objection was raised, this issue is not properly before the court. However, procedural bar notwithstanding, the issue will be addressed on the merits.

¶27. Instruction D6 states:

The Court instructs the jury that you are bound, in deliberating upon this case, to give the defendant the benefit of any reasonable doubt of the defendant's guilt that arises out of the evidence or want of evidence in this case. There is always a reasonable doubt of the defendant's guilt when the evidence simply makes it probable that the defendant is guilty. Mere probability of guilt will never warrant you to convict the defendant. It is only when on the whole evidence you are able to say on your oaths, beyond a reasonable doubt that the defendant is guilty that the law will permit you to find him guilty. You might be able to say that you believe him guilty, and yet, if you are not able to say on your oaths, beyond a reasonable doubt, that he is guilty, it is your sworn duty to find the defendant "Not Guilty."

¶28. Whittington cites *Christmas v. State* to support his proposition that it was error to not grant Instruction D6. However, *Christmas* demonstrates why the denial of this instruction was not error. In *Christmas*, this Court stated:

This Court does not review jury instructions in isolation; rather, they are read as a whole to determine if the jury was properly instructed. *Peoples Bank and Trust Co. v. Cermack*, 658 So.2d 1352, 1356 (Miss. 1995). "[A]n instructional error will not warrant reversal if the jury was fully and fairly instructed by other instructions. *Collins v. State*, 594 So.2d 29, 35 (Miss. 1992); *Laney v. State*, 486 So.2d 1242, 1246 (Miss. 1986). This Court assumes that juries follow the instructions given to them by the trial court." *Id.*; *Payne v. State*, 462 So.2d 902, 904 (Miss. 1984).

*Christmas v. State*, 700 So.2d 262, 269-70 (Miss. 1997).

¶29. The trial court ruled that jury instruction D6 was cumulative. As this Court has stated, the trial court is not required to instruct on the same issue in different language**.** *Cunningham v. State,* 467 So.2d 902, 906 (Miss. 1985); *see also* *Jones v. State*, 381 So.2d 983 (Miss. 1980).

¶30. Whittington argues that by not granting jury instruction D6, his theory of the case was thwarted: the State failed to prove every element of the crime of murder beyond a **reasonable doubt**. Upon examination, this Court finds that several instructions addressing the reasonable doubt issue were given. Instruction 7A states that the State's "... burden is simply to prove **beyond a reasonable doubt** that the accused was present at the time and place testified about and that he murdered Timothy Hodges."

¶31. Interestingly, Whittington had several jury instructions granted that focused on reasonable doubt. Instruction 2 (D1) states that the State must ". . .prove by competent and relevant evidence and **beyond a reasonable doubt** that the Defendant is guilty. . .." Instruction 5 (D4) says that the jury must be convinced by the evidence alone that Whittington is guilty **beyond a reasonable doubt**. Instruction 7 (D5) instructs the jury that if **reasonable doubt** arises, they must acquit Whittington. Instruction 6 (D8) tells the jury that if the evidence or lack thereof raises a **reasonable doubt** as to Whittington's guilt, they must acquit him of the murder.

¶32. Instruction 3 (D3) plainly states the theory of Whittington's case. The instruction states:

The Court instructs the jury that the law presumes every person charged with the commission of a

crime to be innocent. The presumption places upon the State the burden of proving the Defendant guilty of each and every material element of the crime with which he is charged. The presumption of innocence attends the Defendant throughout the trial and prevails at its close, unless overcome by relevant and competent evidence which satisfies the jury of the Defendant's guilt beyond a reasonable doubt. The Defendant is not required to prove anything.

This instruction speaks to every element of the crime as well as the required proof to be beyond a reasonable doubt.

¶33. After reviewing the instructions given, it is clear that the instruction denied, jury instruction D6, was cumulative and correctly denied by the trial court. This issue is without merit.

### III. WHETHER THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE PHOTOGRAPHS OF THE VICTIM WITH GUNSHOT WOUNDS TO HIS HEAD AND ARM.

¶34. Whittington raises this issue in his brief but never discusses it. The State recognizes this fact in its brief but proceeds to address the issue on the merits. We will accordingly address this issue on its merits.

¶**35.** It is well settled in this state that the admissibility of photographs rests within the sound discretion of the trial judge. *Westbrook v. State*, 658 So.2d 847, 849 (Miss. 1995) (citing *Griffin v. State*, 557 So.2d 542 (Miss. 1990), *see also Mackbee v. State*, 575 So.2d 16, 31 (Miss. 1990); *Boyd v. State*, 523 So.2d 1037, 1039 (Miss. 1988). Photographs that are gruesome or inflammatory or that lack an evidentiary purpose are inadmissible as evidence. *McNeal v. State*, 551 So.2d 151, 159 (Miss. 1989). The decision of the trial judge will not be disturbed absent a showing of an abuse of discretion. *Westbrook*, 658 So.2d at 849 (citing *Herring v. State*, 374 So.2d 784, 789 (Miss. 1979), *see also Cabello v. State*, 471 So.2d 332, 341 (Miss. 1985).

¶36. In *Brown v. State*, 690 So.2d 276, 289 (Miss. 1996), this Court stated:

In *Westbrook v. State*, 658 So.2d 847, 849 (Miss. 1995), this Court found that photographs of a victim have evidentiary value when they aid in describing the circumstances of the killing, *Williams v. State*, 354 So.2d 266 (Miss. 1978); describe the location of the body and cause of death, *Ashley v. State*, 423 So.2d 1311 (Miss. 1982); or supplement or clarify witness testimony, *Hughes v. State*, 401 So.2d 1100 (Miss. 1981).

¶37. At the beginning of the trial, Whittington made a motion in limine to have any pictures ruled inadmissible on the grounds that they were more prejudicial than probative. The trial judge examined the photographs and ruled them admissible. The judge specifically ruled that the photographs would be helpful in aiding Dr. Hayne in his testimony. He also noted that the autopsy pictures were made before any incisions were made and that no internal organs were showing. Under the standards set forth in *Brown*, the photographs were properly admitted into evidence. As such, this assignment of error is without merit.

### IV. WHETHER THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

### V. WHETHER JUSTICE WOULD BE BEST SERVED BY THE SETTING ASIDE OF THE VERDICT OF THE JURY AND THE ENTRY OF A VERDICT OF NOT GUILTY

## OR THE GRANTING OF A NEW TRIAL.

¶38. Whittington next contends that the verdict was against the overwhelming weight and sufficiency of the evidence and, as a result, that the verdict should be set aside or a new trial granted. Because these issues are related, they will be addressed together.

¶39. After the State rested its case, Whittington made a motion for a directed verdict which was denied by the trial court. Whittington then offered evidence in his own defense.

¶40. A motion for directed verdict challenges the legal sufficiency of the evidence offered to that point of trial to sustain a guilty verdict. Following the denial of his motion for directed verdict, Whittington offered evidence in his own defense, thereby waiving challenge to the sufficiency of the State's evidence up to that point in time. *Bailey v. State*, 729 So.2d 1255, 1264 (Miss. 1999), *Stringer v. State*, 557 So.2d 796, 797 (Miss. 1990).

¶41. This, however, does not preclude Whittington from challenging the weight or sufficiency of the evidence to sustain the judgment against him. *Id.* (*citations omitted*) All evidence is examined by this Court in determining its sufficiency. *Id.* As we noted in *Bailey*,

> When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all of the evidence-not just that supporting the case for the prosecution-in the light most consistent with the verdict. We give [the] prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb.

*Bailey,* 729 So.2d at 1264, (*quoting McFee v. State*, 511 So.2d 130, 133-34 (Miss. 1987) (*citations omitted*)).

¶42. Whittington was indicted for murder of Timothy Hodges, a human being, in violation of Miss. Code Ann. § 97-3-19. At trial, the State offered numerous witnesses to prove its case.

¶43. Ashley testified as investigating officer and case agent. As case agent, Ashley outlined the evidence that the State would offer during trial.

¶44. Ashley testified that he talked with Lacking at the scene, and, as a result of that conversation in which Lacking identified Whittington as the perpetrator, he sent uniformed officers to arrest Whittington at his home. Ashley drew the two-block route from the crime scene to Whittington's home. Ashley also sketched a drawing that showed the position of Building 22 in the apartment complex to the location of the body at the crime scene. Both drawings were helpful in giving the jury a basis for the testimony of Lacking and Brown. Ashley further testified as to the good condition of the street lights in that area.

¶45. Ashley then testified concerning the different identifications of Whittington as the one who murdered Hodges. Ashley first testified that White unable to positively identify Whittington from a photo lineup.

However, White was later able to positively identify Whittington at a physical lineup.

¶46. Ashley further testified that no test was done on Whittington's hands to detect gunshot residue. Ashley testified that because Whittington was washing dishes when arrested, any residue left by primers when firing a gun would have been washed away.

¶47. Ashley also testified that when Whittington's home was searched, a black and gold jacket was found. This corroborated the eyewitness statements of Lacking, White, and Brown that the perpetrator was wearing a black jacket. Ashley testified that no test for gun shot residue was performed on the jacket because the State Crime Lab had advised him that such a test would be useless.

¶48. Emily Lacking testified that she had known Whittington for a few months before the shooting. Lacking testified that at about 1:30 a.m. on the morning of the murder she heard four shots. After hearing those shots, she saw Whittington running up the hill away from the crime scene waiving a gun and yelling. Lacking testified that Whittington was yelling obscenities and wanting to know who would testify against him. She then saw his mother come out and meet him. Both retreated to Whittington's home. Lacking further testified that there was plenty of light coming from the streetlights to allow her to clearly see Whittington, who was dressed in black.

¶49. Stephen Brown testified that he was in Building 22 at the apartment complex when he saw Whittington shoot Hodges. He also testified that he had known Whittington before the murder. Brown testified that he heard three or four shots and then heard Whittington yelling obscenities, asking who would testify against him. Brown further testified that he saw Whittington shoot Hodges, then kick him in the face when he fell. He testified that the lights were off in the bedroom but that lights were on outside, allowing him to clearly see Whittington shoot Hodges.

¶50. Jacque White testified that he had driven with Hodges to the apartments. White testified that he saw Whittington shoot Hodges. He also testified that he was within six feet of Hodges at the time he was shot and that, because of the lighting, he could clearly see Whittington. White also testified that even though he had trouble positively identifying Whittington in a photo lineup, he had no problem identifying him in a physical lineup. White also testified that Whittington was wearing dark clothes. White testified that he had smoked crack cocaine earlier that night; however, he was not under its influence at the time of the crime and was sure that Whittington was the one who had murdered Hodges.

¶51. Dr. Stephen Hayne testified that Hodges had received two gunshot wounds: one to the arm and one to the head. The shot to the head was fatal. Dr. Hayne also testified that Hodges had a bruise and cut on his forehead, corroborating Brown's testimony that Whittington had kicked Hodges when he fell. Dr. Hayne testified that there would have been no gunshot residue on Whittington's hand because he had washed dishes before being arrested.

¶52. The defense then put on its case. The first defense witness was Roger Johnson, who testified that he had been with Whittington until sometime between 12:30 and 1:00 a.m. on the morning of the murder. However, it was brought out on cross-examination that Johnson had previously told the State that he had dropped Whittington at his home at 12:30 a.m. Johnson also testified that Whittington was wearing a black jacket when he dropped him at home.

¶53. Whittington's mother, Jean Whittington, testified that her son came home at approximately 1:00 or

1:30 a.m. She vehemently denied that Whittington arrived home later than 1:30 a.m. However, it was brought out on cross-examination that she told the officers who had arrested Whittington that he had been home less than one hour when they arrived at the home at approximately 2:40 a.m.

¶54. On rebuttal, the State called Officer David Elson to the stand. Elston, the officer who arrested Whittington, stated that he arrived at the Whittington home around 2:40 a.m. and found Whittington washing dishes. Elson also testified that Whittington's mother told him that Whittington had been home less than an hour.

¶55. This Court's ability to interfere with a jury verdict is quite limited. This Court must give the prosecution the benefit of all favorable inferences that may be drawn from the evidence.

¶56. In the case *sub judice*, there were two eyewitnesses, Brown and White, to the actual shooting. In addition, there was a witness, Lacking, who saw Whittington leaving the crime scene, waving a gun in the air and shouting. Another witness, Brown, corroborated Lacking's statement regarding Whittington waiving the gun in the air and shouting.

¶57. On cross-examination, the State was able to cast doubt upon the two defense witnesses' statements regarding the time Whittington arrived home. While the defense did offer an alibi defense, the discrepancies between the State's case and that of the defense were properly left for the jury. As such, these two issues are without merit.

## CONCLUSION

¶58. The judgment of the trial court and the conviction and the life sentence in the Mississippi Department of Corrections are affirmed.

¶59. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRIS0NMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED**.

> **PRATHER, C.J., SMITH, MILLS, WALLER AND COBB, JJ. CONCUR. BANKS, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J. AND McRAE, J.**

BANKS, JUSTICE, CONCURRING:

¶60. I do not agree that the defendant's proffered instruction D-6 was cumulative, and I believe that it should have been given. I, nevertheless, concur with the result reached by the majority because, in my view the evidence is such that the failure to give the instruction is harmless error.

¶61. This instruction goes beyond merely and repetitiously reciting that the burden of proof is "beyond a reasonable doubt" and attempts instead to add clarity to that standard. It does not offend our maxim prohibiting instructions attempting to define "reasonable." **Simpson v. State**, 497 So. 2d 424, 430 (Miss. 1986). In a given case the failure to give it or similar instructions may require reversal either singly or in combination with other error.

**SULLIVAN, P.J., AND McRAE, J., JOIN THIS OPINION.**