# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-KA-00586-SCT

*ZACHARY STRINGER a/k/a ZAC STRINGER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/26/2013 |
| TRIAL JUDGE: | HON. PRENTISS GREENE HARRELL |
| COURT FROM WHICH APPEALED: | MARION COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY:  W. DANIEL HINCHCLIFF |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  BILLY L. GORE |
| DISTRICT ATTORNEY: | HALDON J. KITTRELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED -  02/13/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., PIERCE AND KING, JJ.**

**KING, JUSTICE, FOR THE COURT:**

¶1.     Zachary Stringer (Zachary), a minor, was charged with the murder of his younger

brother, Justin Stringer (Justin).  The jury found Zachary guilty of the lesser-included offense

of manslaughter.  The trial court sentenced Zachary to twenty years, with ten years to serve

and ten years of post-release supervision, with five years reporting.  Zachary is to serve his

sentence in the custody of the Mississippi Department of Corrections (MDOC) in the

Youthful Offender Unit of the Central Mississippi Correctional Facility.

¶2.     Zachary appeals his conviction and sentence, raising two issues: (1) whether the trial court erred by allowing multiple gruesome photographs of the victim and the crime scene into evidence; and (2) whether the trial court erred in denying Zachary's motion for judgment notwithstanding the verdict (JNOV).   Finding no error, this Court affirms Zachary's conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶3.     Roger Dale Stringer (Roger), Zachary and Justin's father, testified that his sons were hunters, and that they were familiar with guns and gun safety.  Both boys had gun racks in their rooms, and each had two guns and ammunition.  Roger personally taught the boys everything he knew about gun safety, and Zachary had taken a firearm-safety course. According to Roger, Zachary was one of the safest people he had ever seen with a firearm.

¶4.     On June 11, 2011, Roger had spent quality time with his sons throughout the day and had returned the boys to their mother's home at approximately 8:15 p.m.  According to Roger, a television show was airing at 8:30 p.m. which Zachary wanted to watch.  Kim Stringer (Kim), the boys' mother, was attending a party, so the boys were home alone.

¶5.     Justin called Kim on her cell phone at approximately 8:21 p.m.  He asked Kim where she was and if she could come get him.  Kim agreed and told Justin she would pick him up after she was done eating.  According to Kim, nothing was unusual about Justin's call; he did not seem upset, and he just "liked to go places."  At 8:42 p.m., Kim received a phone call from the home phone.  Because the party was loud, Kim declined the call and walked away to a more quiet area.  A few moments later, Kim received another call from the home phone;

2

this time, it was Zachary. She answered and Zachary told her that Justin had been shot.

¶6. Frantic, Kim called Roger and informed him that something was wrong with Justin. Roger immediately drove back to Kim's house, which was approximately three miles away. While in route, Roger received a phone call from Zachary. Zachary said, "I love you, daddy . . . you know that, don't you?" Roger responded in the affirmative. Then, Zachary told Roger that Justin was dead, and that he had been shot with the .25-06 rifle.[1] Roger called 911 immediately, and the sheriff's office was dispatched to the scene.

¶7. Roger arrived at Kim's house first. Zachary attempted to stop his father from entering the home, but Roger pushed past Zachary. As Roger entered, he saw blood splattered on the wall. Justin's body was sitting in a chair, and the top of his head was missing. According to Roger, the only thing there was the roof of Justin's mouth. Roger also noticed Justin's twenty-gauge shotgun lying between his legs. Blood was on the end of the barrel. Roger stated that the scene did not look right and did not add up. Kim arrived at the house a short while later, but Zachary and Roger did not allow her to enter the home.

¶8. Next, police and medical responders arrived at the home. Zachary told Cole Robbins, a medical responder, there was "no use" in entering the home. Despite this warning, Robbins entered and found Justin in a chair with a traumatic gunshot wound to the head. Justin was still breathing but he had no pulse. Zachary told Robbins that he was in his bedroom when he heard the gunshot. Because Zachary's clothes were bloody, the clothing was collected as evidence. Robbins was allowed to retrieve clean clothes from Zachary's closet. While in Zachary's room, Robbins noticed a bloody fingerprint on the closet shelf. He immediately

---

[1] The .25-06 rifle was Zachary's personal gun.

3

notified Investigator Jamie Singley of this discovery. Investigator Singley entered Zachary's room and noticed more evidence: a spent .25-06 rifle cartridge casing on the closet floor, bloody footprints on the carpet, and a .25-06 rifle with blood on it. All items were tested, and it was confirmed the blood belonged to Justin. According to Investigator Singley, these findings negated the report of a self-inflicted wound.

¶9. Zachary gave three statements to police. On June 13, 2011, Zachary, along with his parents, voluntarily gave the sheriff's office a handwritten statement in which he claimed Justin had shot himself. In pertinent part, Zachary stated that Justin had shot the family dog with a dart gun,[2] and the dog had run into Zachary's room. Zachary removed the dart from the dog, went into the living room, and returned the dart to Justin. As Zachary left to return to his room, Justin said, "I love you Zac," and Zachary responded, "I love you too man." Zachary returned to his room, put his rifle away, and continued to watch a movie. Seconds later, Zachary heard a shot. He ran into the living room, and blood hit him in the face instantly. Zachary ran to Justin, apologized for "all the crap" he had put him through, told Justin he loved him, and gave him a hug. Next, Zachary called his parents and told them Justin had been shot. Following this statement, Investigator Lee Cotton obtained a warrant for Zachary's arrest, which was served on June 17, 2011.

¶10. Zachary gave a second statement to Investigator Singley and Investigator Cotton on August 5, 2011. This time, Zachary's attorney was present. The statement was written and recorded. Zachary's second statement began like the first: Justin shot the dog with the dart gun. This time, however, Zachary said that he took the dog to Justin. Zachary stated that he

[2]Justin had just received a blow-dart gun as a present.

4

turned to go back to his room when Justin asked if they could talk. Zachary replied, "Hang on man. Let me get us a conversation piece." Zachary retrieved his .25-06 rifle from his room and returned to the living room. Zachary sat on the couch, and he and Justin talked for about ten minutes. In the recorded statement, Zachary said they talked about hunting. Zachary stated that he got up from the couch, heard a click, the gun went off, and the recoil caused the gun to fly out of his hand. Zachary said that he "did not check the action." According to Zachary, he went over to Justin, gave him a hug, told him he loved him, and said that he would miss him. Zachary admitted that he put his rifle in the closet, placing it on the top shelf. He had retrieved Justin's twenty-gauge shotgun, fired a round into the woods, and placed the shotgun between Justin's legs. Zachary admitted that he "was trying to make it look like an accident." Zachary realized "it would raise questions" if his rifle was found in the closet, so he placed it on the gun rack.

¶11. The third statement was an oral statement given to Ricky Dean, a Mississippi Highway Patrol investigator, on August 12, 2011. According to Dean, Zachary said that Justin had been pestering him with the dart gun, pretending to shoot at him. Zachary told Justin, "if you shoot me with that, I'll shoot you with this," referring to his .25-06 rifle. According to Dean's testimony, Zachary said he had dropped a magazine and loaded a round into the chamber. When Zachary got up, the rifle went off, shooting Justin. Zachary maintained that he did not shoot Justin intentionally.

¶12. At trial, experts testified regarding Justin's manner of death and tests performed on the .25-06 rifle. Dr. Erin Barnhart, deputy chief medical examiner, testified that Justin's manner of death (accidental shooting or homicide) could not be determined. Neither Dr.

5

Barnhart nor the previous medical examiner was able to determine the angle of trajectory or path of the projectile. According to Dr. Barnhart, this could have been done if she had the complete skull; however, the skull had shattered into many pieces. Regardless, Dr. Barnhart opined that she still could not have determined whether the death was a homicide or an accident even if she had the benefit of the entire skull.

¶13. Lori Beall, a forensic scientist at the Mississippi Crime Laboratory, tested the firearm and the projectiles recovered from the scene. Some of the projectiles were mutilated and were of no comparison value. Beall was able, however, to test a projectile recovered from Justin's chair and determined that the projectile was consistent with the type of projectile used in a .25-06 rifle, like Zachary's. Beall also conducted several functional-reliability tests on Zachary's rifle to determine if the rifle could or would discharge accidentally. The tests did not produce any accidental discharge, and thus confirmed that the rifle was in good working order. Beall also tested the trigger. Roger testified that Zachary's rifle had a "hard trigger," which took considerable force to fire. Beall testified that Zachary's rifle had an adjustable trigger. According to Beall, Zachary's trigger had never been adjusted, and it took more than five pounds to release the trigger.

¶14. Several of Zachary's family members testified regarding his behavior leading up to and during Justin's funeral. Debbie Peavy, Zachary's great aunt, stated that Zachary did not seem upset, and that he had made several strange comments. Peavy said that Zachary, while preparing for Justin's funeral, modeled his new suit and said, "I look pretty good now[;] maybe I can get all the girls." Zachary also had expressed that he would get all the Christmas presents now. Peavy testified that Zachary, while watching a video tribute for Justin,

6

laughed and said, "Look at Justin's teeth . . . people won't be laughing at his teeth anymore. At the wake, Zachary had noticed one of Justin's female friends and had asked Peavy about her. Peavy informed Zachary that Justin had been talking to and texting the girl. In response, Zachary stated, "Well she's pretty. I can see why Justin liked her, maybe I'll try to talk to her now."

¶15. April Markins, Zachary's aunt, testified regarding a comment Zachary made to her while he was greeting visitors in the receiving line. Markins told Zachary she was sorry about what had happened to Justin, and Zachary replied, "Look at momma and daddy[;] they're making idiots of themselves." Ryan Stringer (Ryan), Zachary's uncle, testified regarding how Zachary was boastful about his new suit. Ryan also overheard Zachary say that he wished Justin could shoot him with the blowgun one more time, and he had overheard Zachary say that Justin had shot him in the foot with the blowgun. Roger testified that, while watching the funeral procession, Zachary commented, "I wonder if that many people would show up at my funeral."

¶16. After both sides had rested, the trial court went over jury instructions. In addition to a murder instruction, the State requested a jury instruction for the lesser-included offense of manslaughter. Defense counsel objected. The trial court, however, allowed the manslaughter instruction. The jury found Zachary guilty of manslaughter. The trial court sentenced Zachary to serve twenty years in the custody of MDOC, with ten years to serve, ten years of post-release supervision, and five years reporting; he also was ordered to pay a $10,000 fine. The trial court denied Zachary's post-trial motions. Aggrieved, Zachary timely filed his notice of appeal.

ANALYSIS

¶17.    Zachary raises two issues on appeal: (1) whether the trial court erred by allowing gruesome photographs, depicting the crime scene and autopsy, into evidence, and (2) whether the trial court erred by denying Zachary's motion for a judgment notwithstanding the verdict (JNOV).

### I. Photographs

¶18.    This Court reviews the trial court's admission or exclusion of evidence for an abuse of discretion. *Davis v. State*, 849 So. 2d 1252, 1255 (Miss. 2003). "Photographs of a victim have evidentiary value where they '1) aid in describing the circumstances of the killing and the corpus delicti; 2) where they describe the location of the body and cause of death; and 3) where they supplement or clarify witness testimony.'" *Id*. (citing *Westbrook v. State*, 658 So. 2d 847, 849 (Miss.1995)). "Photographs of the victim[, however,] should not ordinarily be admitted into evidence where the killing is not contradicted or denied and the corpus delicti and the identity of the deceased have been established." *Conners v. State*, 92 So. 3d 676, 687 (Miss. 2012) (quoting *Jordan v. State*, 995 So. 2d 94, 110 (Miss. 2008)). Reversal based on the admission of cumulative and/or gruesome photographs is rare. *Id*. (citing *Barfield v. State*, 22 So. 3d 1175, 1181 (Miss. 2009)).

¶19.    The trial court admitted thirty-three photographs into evidence, depicting the crime scene, Justin's body, evidence collected by police, and an autopsy photograph. Zachary takes issue with all thirty-three photographs, specifically those photographs of the crime scene, Justin's body, and the autopsy photograph. Photographs of the crime scene depict blood splattered on the wall and brain matter and skull pieces scattered on the floor.

8

Photographs of Justin's body were taken from various angles and depict Justin's body in a chair with a twenty-gauge shotgun between his legs. The investigators also took closeup photographs of Justin's injuries. The top of Justin's head – from his nose upward – was completely gone.

¶20. Zachary argues that the photographs admitted into evidence were gruesome, redundant, and more prejudicial than probative. To support his argument, Zachary notes that the trial-court judge stated that the photos were "extraordinarily graphic" and "very difficult," and yet still allowed the photographs into evidence. Zachary also argues that the trial court failed to limit the number of photographs necessary for any evidentiary point and failed to examine the photographs separately to assess their probative value. According to Zachary, the thirty-three photographs served no evidentiary purpose or probative value, and the photographs were used simply to inflame and arouse the emotions of the jury.

¶21. The State concedes that the photographs are gruesome; however, the State claims that the photographs have probative value. According to the State, the photographs provide evidence regarding the circumstances of the shooting, the location of Justin's body, and the cause of death. The State also argues that the photographs help clarify witness testimony. The State notes that the jury's guilty verdict as to manslaughter, instead of murder, proves that the jury was not inflamed or aroused by the photographs. Also, the State claims that defense counsel used the photographs in his closing statement to demonstrate that the shooting could not have been intentional.

¶22. Undoubtedly, the photographs of Justin's head injury are difficult to view. However, they have probative value. The trial court reviewed the photographs and, under Mississippi

9

Rule of Evidence 403, properly weighed the probative value against the danger of unfair prejudice. The trial court found that, although difficult to view, the photographs aided in describing the location of the body and cause of death and clarified witness testimony.

¶23. Zachary maintains that the photographs were neither necessary for identification purposes nor to identify the cause of death.[3] In addition, Zachary claims that the proof against him showed only that the shooting was an accident and, thus, the photographs were not needed to explain the circumstances surrounding Justin's death or to clarify any witness testimony. While who killed Justin was not contradicted, the State counters that the manner of death – homicide or accident – was disputed, and that the photographs were relevant to that point.

¶24. In *Davis v. State*, a fifteen-year-old defendant admitted shooting into a camp cabin. *Davis v. State*, 849 So. 2d 1252, 1253 (Miss. 2003). The victim was shot in the face, which produced severe injuries and killed him instantly. *Id*. On appeal, Davis, in pertinent part, argued that the trial court erred by admitting into evidence gruesome photographs of the crime scene and the victim's autopsy:

> Four of the disputed photographs depicted the interior of the camp cabin and the location and relation of Arnold's body to the interior and blood splatters on the wall and floor. Two other photographs were taken during the autopsy each of which depict the injuries to each side of Arnold's face and head.

*Id*. at 1254. In a unanimous decision, the Court found that the photographs "served the

_____

[3]Zachary states that Dr. Barnhart could not use the autopsy photograph to identify Justin because she did not conduct the autopsy. He also states that Investigator Singley, through his testimony, established the nature of the wound. Thus, the photographs were unnecessary and used only to inflame the passions of the jury.

legitimate evidentiary purpose of depicting the angles and trajectories of the gunshots about which . . . the forensic pathologist who performed the autopsy, testified, and they did not to [sic] inflame the jury." *Id*. at 1255. Accordingly, the Court ruled that the probative value of the photographs did outweigh the danger of unfair prejudice; thus, the trial court did not err by admitting the photographs. *Id*.

¶25. In *Baldwin v. State*, the State sought to introduce 100 photos of the victim's body. *Baldwin v. State*, 784 So. 2d 148, 158 (Miss. 2001). The trial court noted that the photographs were gruesome, but found that the photos depicted the extent of the victim's injuries and, thus, possessed evidentiary value. *Id*. at 157-58. The trial court, however, allowed only five to eight of the 100 photos into evidence.[4] *Id*. at 157. On appeal, Baldwin challenged the admission of the photographs. The Court found that the photographs "[did] not rise to the level of inflammatory gruesomeness," showed the location of the body and extent of the victim's injuries, and clarified the forensic scientist's testimony. *Id*. at 158. Accordingly, the Court approved the trial court's exercise of discretion. *Id*.

¶26. In one case, the Court reversed a murder conviction based on gruesome photographs of the victim's body, which was nude, partially decomposed, and surrounded by maggots. *McNeal v. State*, 551 So. 2d 151, 159 (Miss. 1989). The Court held that alternative photographs could have been used to show the fatal wound. *Id*. Accordingly, the Court found that the photographs' probative value was outweighed by the danger of unfair prejudice. *Id*.

---

[4]In *Baldwin*, the opinion states that five photographs were admitted and later states that eight photographs were admitted. *See Baldwin*, 784 So. 2d at 157-58.

11

¶27.    Of the thirty-three admitted photographs in this case, five photographs showed Justin's body from a distance,[5] three photographs showed his injuries close up, one photograph depicted his autopsy, and three photographs depicted brain matter and skull, which had landed on the floor. The remaining photographs depicted blood splatters and the evidence collected. Thus, given the variety of different subjects depicted by the photographs, the sheer number of photographs is not alarming.

¶28.    While photographs of Justin's body are difficult to view, the photographs did not rise to the level of inflammatory gruesomeness exhibited in *McNeal* and have evidentiary value. Justin's manner of death was disputed. Zachary proclaimed it was an accident, and the State proclaimed it was a homicide. The photographs aided the jury in determining the circumstances of the killing.

¶29.    The photographs also were useful to clarify witness testimony. For instance, both Roger and Investigator Singley testified that Justin's shotgun was sitting between his legs, indicating that the injury may have been self inflicted. Both also testified that, based on the nature of the wound and other evidence, it could not have been a self-inflicted wound. Furthermore, defense counsel harped on the State's failure to determine the trajectory of the shot. As explained by Investigator Singley and Dr. Barnhart, and clarified and confirmed by photographs, Justin's skull was in numerous pieces, which made it difficult to reconstruct the skull and determine the path of the bullet.

¶30.    Additionally, the photographs helped clarify the three statements Zachary made to

[5]In the distant photographs, Justin's injuries are barely visible.

12

investigators. In his second statement, Zachary claimed that his rifle accidentally discharged when he stood up from the sofa. In his third statement, Zachary told Investigator Dean that he had threatened to shoot Justin if Justin continued to pester him, and he had loaded a round into the chamber. Although Zachary claims the shooting was accidental, the photographs provided evidence – such as the location of the body and the distance of the sofa from Justin's chair – for the jury to determine the validity of that claim.

¶31.    Based on the foregoing, the photographs provided evidentiary value and were more probative than prejudicial. Further, no evidence exists that the photographs were used to inflame the jury. Accordingly, this Court finds that the trial court did not abuse its discretion in allowing the photographs into evidence.

## II. JNOV

¶32.    A motion for JNOV challenges the legal sufficiency of the evidence. ***Knight v. State***, 72 So. 3d 1056, 1063 (Miss. 2011). When ruling on a motion for a JNOV, the trial court must view all credible evidence consistent with the defendant's guilt in the light most favorable to the State. ***Id***. This Court will not disturb the trial court's ruling if "the evidence shows 'beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed[.]" ***Id***. (quoting ***Bush v. State***, 895 So. 2d 836, 843 (Miss. 2005)). But "where the evidence fails to meet this test it is insufficient to support a conviction" and reversal is required. ***Id***.

¶33.    Zachary was convicted of manslaughter as a lesser-included offense of murder. Zachary argues that the evidence was insufficient to prove culpable-negligence manslaughter. According to Zachary, the evidence showed only that Justin's killing was an accident, and

13

Zachary committed no affirmative act of culpable negligence. He also claims that the State failed to prove the angle of trajectory, leaving the jury to infer an intentional killing based on Zachary's demeanor and inappropriate comments.

¶34. The State argues that it presented sufficient evidence to justify a murder conviction and, indeed, a conviction for manslaughter. The State contends that "[w]here there is evidence to justify a murder conviction, the appellant cannot complain of a manslaughter conviction." *Hubbard v. State*, 437 So. 2d 430, 438 (Miss. 1983). According to the State, a reasonable jury could have concluded Zachary was guilty based on the physical evidence, the conflicting statements Zachary had given to investigators, and Zachary's demeanor following Justin's death.

¶35. Manslaughter is "[e]very other killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law . . . ." Miss. Code Ann. § 97-3-47 (Rev. 2006). Zachary claims that the State presented no evidence of culpable negligence. However, a reasonable jury could have found that the State met every element of manslaughter based on the physical evidence and Zachary's statements to investigators.

¶36. Although Zachary later admitted fault in Justin's killing, he initially claimed that Justin had shot himself. In his second statement, Zachary stated that he had gotten a "conversation piece" – his rifle – to have a talk with Justin, and the rifle had discharged accidentally. He admitted staging the scene and putting his rifle away to make Justin's death look like an accident. In his third statement, Zachary said that he had threatened to shoot Justin if Justin continued to pester him. He also admitted loading the rifle. Zachary still claimed that the rifle discharged accidentally. Evidence also was presented that Zachary's

14

rifle had a "hard" trigger, and, when tested by the Mississippi Crime Laboratory, the rifle did not discharge accidentally or appear to be faulty.

¶37. Zachary argues that he did not know the rifle was loaded, and he did not deliberately point the rifle at Justin. The evidence, however, tells a different story. In at least one statement, Zachary admits that he loaded the rifle and threatened to shoot Justin. Also, the physical evidence – Justin's gunshot wound – suggests that the rifle could have been pointed directly at Justin's head.[6] Zachary complains that the State failed to prove the bullet's angle of trajectory and, thus, failed to disprove Zachary's theory that the shooting was an accident. While evidence of the bullet's angle of trajectory would have supplemented the State's evidence, Zachary's provides no caselaw which mandates that such evidence is necessary for a conviction. *See **Simmons v. State***, 805 So. 2d 452, 487 (Miss. 2001) (stating that "[f]ailure to cite relevant authority obviates the appellate court's obligation to review such issues.")

¶38. The jury considers the weight and credibility of the evidence. ***Butler v. State***, 102 So. 3d 260, 270 (Miss. 2012). From the verdict, the jury believed neither Zachary's claim that the shooting was an accident nor the State's claim that the shooting was intentional. The jury, instead, convicted Zachary of manslaughter, finding that Justin's killing was a result of Zachary's culpable negligence. Viewing all credible evidence consistent with Zachary's

---

[6]"Even where a defendant claims the firing of a gun is accidental, pointing a loaded gun at an individual supports a conviction of manslaughter because the defendant's actions 'show a conscious, wanton and reckless disregard of the likely fatal consequences of his willful act which created an unreasonable risk.'" ***Tait v. State***, 669 So. 2d 85, 89 (Miss. 1996) (quoting ***Jernigan v. State***, 305 So. 2d 353, 354 (Miss.1974)).

15

guilt in the light most favorable to the State, ample evidence of culpable negligence existed, and the evidence was legally sufficient to prove beyond a reasonable doubt that Zachary committed the elements of the offense of manslaughter.

## CONCLUSION

¶39. The trial court did not abuse its discretion in allowing the photographs into evidence. And, the evidence was legally sufficient to support the jury's verdict. Thus, this Court affirms Zachary's conviction and sentence for manslaughter.

¶40. **CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH TEN (10) YEARS TO SERVE AND THE REMAINING TEN (10) YEARS TO BE SERVED UNDER POST-RELEASE PROVISIONS WITH A FIVE (5) YEAR SUPERVISION PERIOD, WITH CONDITIONS, AFFIRMED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE AND COLEMAN, JJ., CONCUR.**