**IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI**

**NO. 2024-CA-01247-COA**

**ZACHARY STRINGER**                                          **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/09/2024 |
| TRIAL JUDGE: | HON. PRENTISS GREENE HARRELL |
| COURT FROM WHICH APPEALED: | MARION COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | SCOTT JOSEPH SCHWARTZ |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ABBIE EASON KOONCE |
| NATURE OF THE CASE: | CIVIL - POST-CONVICTION RELIEF |
| DISPOSITION: | AFFIRMED - 03/17/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., WEDDLE AND LASSITTER ST. PÉ, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.    In 2013, Zachary Stringer, at the age of fifteen years old, was convicted of the lesser-included offense of manslaughter for the shooting death of his eleven-year-old brother, Justin Stringer.  He was sentenced to twenty years, with ten years to serve and ten years of post-release supervision, in the custody of the Mississippi Department of Corrections.[1] Stringer appealed, and the Mississippi Supreme Court affirmed his conviction and sentence in *Stringer v. State*, 131 So. 3d 1182 (Miss. 2014).[2]

---

[1]  In October 2016, Stringer was released from incarceration for good behavior, after having served approximately five years.

[2]  On direct appeal, Stringer argued that the trial court erred in allowing multiple gruesome photographs of the victim and the crime scene into evidence and in denying his

¶2.     In November 2017, Stringer filed a motion for post-conviction relief (PCR)[3] in the Marion County Circuit Court, requesting his conviction be vacated and he be granted a new trial based upon newly discovered evidence.  The new evidence was based upon a Remington recall that Stringer's father discovered approximately two years after Stringer's trial.  The recall was for the same model and type of trigger as Stringer's rifle—a Remington Model 700 bolt-action rifle equipped with an X-Mark Pro (XMP) trigger.  The recall was to repair and replace the XMP trigger because some triggers had a condition that would cause the rifles, "under certain circumstances," to discharge unintentionally.

¶3.     In April 2024, Stringer's rifle was tested and examined under a strict protocol agreed upon by the parties.  It did not misfire, nor did it have the condition described in the recall. After an evidentiary hearing, the trial court denied Stringer's PCR motion.  On appeal, Stringer now argues that the trial court erred in not granting him a new trial due to the new evidence consisting of the Remington XMP recall, a change in his father Roger's testimony due to the recall, and Exhibit P-4.  This exhibit, submitted during the evidentiary hearing, consisted of seventeen Remington incident reports Roger compiled from 2014 to 2016 involving recalled Remington 700 XMP rifles.  After a thorough review of the record, we conclude that the trial court did not err in denying Stringer post-conviction relief and affirm the trial court's order.

---

motion for judgment notwithstanding the verdict.  *Id.* at 1187 (¶17).

[3] Stringer timely sought leave from the Mississippi Supreme Court under Mississippi Code Annotated section 99-39-7 (Rev. 2020) before filing his PCR motion in the circuit court, and the supreme court granted his request.

**FACTS AND PROCEDURAL HISTORY**

¶4.    We shall begin with the evidence introduced at Stringer's criminal trial and then present the new evidence Stringer provides.[4]

***Evidence at Trial***

¶5.    On June 11, 2011, Roger spent the day with his sons and then dropped them off at their mother's house at approximately 8:15 p.m.[5]  Roger knew their mother, Kim, was at a party; so the boys were home alone.  At approximately 8:20 p.m., Justin called his mother on her cell phone, asking if she would come get him.  Kim testified that nothing was unusual about Justin's call; he did not sound upset.  Approximately twenty minutes later, Kim received two calls from her home phone.  She declined the first call because she could not hear it.  She accepted the second call.  It was Stringer, who was very upset.  He told his mother that Justin had been shot.  Hysterical, Kim called Roger, who immediately drove to Kim's nearby house.  On the way, Roger received a call from Stringer, who was very upset.  Stringer told his father that Justin had been shot with Stringer's Remington 700 XMP rifle,[6] and he was dead.  Roger called 911, and law enforcement officers were dispatched to the house.

¶6.    When Roger arrived at the house, Stringer tried to prevent him from entering, but

---

[4]  Some of our facts will be taken from the original appellate opinion, authored by Justice King of the Mississippi Supreme Court in *Stringer v. State*, 131 So. 3d 1182 (Miss. 2014), to provide context.

[5]  At the time, Roger and Kim were separated.

[6]  Roger had given Stringer this rifle for Christmas in 2008.

Roger pushed past Stringer to find a horrific scene. Blood was splattered on the walls. Justin's body was sitting in a chair. The only part of the top of Justin's head that remained was the roof of his mouth. Roger noticed Justin was still breathing and began to pray. Roger also noticed that Justin's twenty-gauge shotgun was lying on his son's lap. Kim arrived soon after but was prevented from entering the house.

¶7. When first responders and law enforcement arrived at the scene, Roger told them it was "no use." They found Justin was sitting in the chair with "a very traumatic gunshot wound to the head." "There was brain matter and blood all over the house, reaching all the way into the kitchen" and on the ceilings, as well as pieces of Justin's skull "everywhere." Justin was still breathing but had no pulse. He continued to breathe for approximately fifteen minutes after medical responders arrived, but nothing could be done—"the top of his head was gone."

¶8. Stringer told a medical responder that he was in his bedroom when he heard a gunshot. He went to the living room and found Justin shot. Stringer's clothes were collected for evidence because they were bloody. When the responder went into Stringer's bedroom to retrieve clean clothes, he saw bloody fingerprints on a closet shelf. He notified an investigator, who saw a spent rifle shell casing on the closet floor, as well as bloody footprints on the carpet. A rifle was on a gun rack with blood on it. Testing confirmed the blood all belonged to Justin, contradicting Stringer's initial claim that the gunshot was self-inflicted.

¶9. Stringer gave three different statements to law enforcement about what happened.

4

On June 13, 2011, two days after the shooting, Stringer voluntarily gave his first statement, claiming Justin shot himself. Stringer recounted that Justin had a newly acquired blow dart gun and shot the family dog with it. Stringer removed the dart and gave it back to Justin in the living room. After returning to his bedroom, Stringer heard a gunshot. He ran into the living room where "blood hit him in the face instantly." Stringer gave Justin a hug and then called his parents. Stringer later was arrested after Justin's funeral on June 17.

¶10. On August 5, 2011, Stringer gave a second statement to law enforcement. Represented by counsel this time, Stringer stated that after Justin shot the dog with the dart gun, Justin asked his brother if they could talk. Stringer agreed but said, "Let me get us a conversation piece." He retrieved his rifle from his room and returned to the couch. He and Justin were talking about hunting when Stringer claimed he got up from the couch, heard a "click," and the rifle went off. The recoil from the rifle caused it to fly out of Stringer's hand and ultimately land on the floor. Stringer stated that "it was immediate," Justin "didn't feel a thing," and it looked "like a bomb blew up in [Justin's] head." Stringer went to Justin and gave him a hug. In this statement, Stringer admitted that he put his rifle in the closet on the top shelf. Then, he retrieved Justin's twenty-gauge shotgun, fired a round into the woods, and placed the shotgun between Justin's legs. Stringer admitted that he "was trying to make it look like an accident." Stringer also admitted to moving the rifle from the closet to his gun rack so that it would not "raise questions."

¶11. On August 12, 2011, Stringer gave a third statement to law enforcement. Stringer explained that Justin had been pestering him with the dart gun. Stringer told Justin, "[I]f you

shoot me with that, I'll shoot you with this," referring to his rifle. Stringer "dropped a magazine" and "loaded a round" into the rifle's chamber. Stringer claimed that when he stood up, the rifle went off, shooting Justin. Stringer stated that he did not intentionally shoot Justin.

¶12. At trial, Roger testified for the State. On the morning of June 11, he took Justin to a turkey hunting event for youth; then he "swapped boys" and took Stringer swimming in the afternoon. Roger then took both boys out to eat dinner before dropping them back off at Kim's house at approximately 8:15 p.m. Roger drove to his parents' house nearby. About five minutes later, Kim was hysterical and called Roger; "Justin" was the only word Roger could understand. On his way to Kim's house, Stringer called, saying, "Daddy, I love you, you know that, don't you?" Roger responded, "Yeah buddy, what happened?" Stringer told his father, "Justin is dead. . . . He's been shot. . . . with the [rifle]." Roger testified he "lost it," hung up, and called 911. At the scene, Roger testified that he and Stringer hugged "and told each other how much [they] loved each other." However, Roger testified that the scene and position of the shotgun on Justin's legs "just didn't look right." Roger asked Stringer about it, but Stringer became upset, saying, "Daddy, do you think I killed him?" Roger testified he "felt ashamed for letting such a thought . . . enter [his] head, because he's my son." Roger maintained on the stand that he loved both of his sons.

¶13. Additionally, Roger testified that both of his sons were hunters and each had access to two guns with ammunition on gun racks in their bedrooms. Roger testified, "They were thoroughly familiar with gun safety." Stringer had taken a course, and Roger taught them

6

everything he could. Roger allowed guns and ammunition in his sons' rooms because he felt certain they would not be reckless with them. According to Roger, Stringer was the safest with a gun as any person he had ever seen. Roger was satisfied that Stringer knew how to operate his rifle properly.

¶14. Regarding Stringer's rifle, Roger never remembered any misfires, mechanical problems, or dangers with the gun. Stringer used it for target practice and hunting deer. Roger testified that Stringer's rifle had a "hard trigger" "that took considerable force to fire" and a "fairly hard safety," which would "click" when turned off.

¶15. At trial, two experts testified for the State. Dr. Erin Barnhart, deputy chief medical examiner, testified that the manner of Justin's death—accidental shooting or homicide—could not be determined. Because Justin's skull had been shattered into many pieces, the path of the projectile could not be determined. However, even with a complete skull, she opined that Justin's manner of death would not be determinable.

¶16. Lori Beall, a forensic scientist specializing in firearms identification at the Mississippi Forensics Laboratory, testified about the projectiles and rifle recovered from the scene. Beall performed functional reliability tests and a trigger-pull test on Stringer's rifle to determine if the rifle could discharge accidentally, which she testified to as follows:

> The firearm is first test fired. We fire four live rounds through the firearm into a water recovery tank. Once it is test fired, then we do a 3-foot drop test with the manual safety on, to see if it would discharge accidentally. Also we do a drop test with the safety off, to see if it would discharge accidentally. We also have special mallets that we use. It's a rawhide mallet that we use. We also chamber a live empty, which is just a cartridge that has the projectile removed but the primer is still intact, so we would know that it would go off. We would chamber that live empty, take the rubber mallet, put the safety on.

7

We would hit the bolt in question—on this firearm it is a bolt action, meaning it has a bolt that actuates the cartridge into the chamber. Once that is actuated into the chamber, if you hit the back of that bolt, the firearm would not discharge accidentally with the safety on or with the safety off.

Stringer's rifle did not accidentally discharge during the tests. Beall testified that the tests showed the rifle was "in good working order." Additionally, Beall tested the rifle's "trigger pull." Beall testified that the poundage required to release the firing pin when pulling the trigger was greater than five pounds.

¶17. The jury also heard testimony from several relatives and friends about Stringer's exhibiting very strange behavior and making inappropriate comments after Justin was killed, both before and after his funeral. The jury was instructed on both deliberate-design murder and manslaughter and found Stringer guilty of the lesser-included offense of manslaughter.

### *Newly Discovered Evidence*

¶18. In November 2017, Stringer filed his PCR motion, claiming that "there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice" under Mississippi Code Annotated section 99-39-5(1)(e) (Rev. 2020). The new evidence was Remington's April 2014 voluntary recall of its Model 700 and Model Seven rifles with XMP triggers that were manufactured between May 2006 until April 2014. Remington sold approximately 1.3 million rifles during this time, including Stringer's rifle. Roger discovered the XMP recall in March 2015 on the Internet, after Stringer's trial, conviction, and direct appeal.

¶19. Stringer's PCR motion described the specific issue behind Remington's voluntary

recall of its Model 700 XMP rifle:[7]

> [A]ll XMP rifles manufactured between 2006 and May 2014 were assembled using a technique that required 'rolling' the entire length of the 'blocker screw' . . . in a glue-like substance called 'Loctite.' During normal operation of the rifle, the blocker screw pushes back against the trigger and 'blocks' it from moving forward when the safety is 'on.' When the safety is switched 'off,' the blocker screw pulls away from the trigger so the trigger is able to move forward when it is pulled. Remington's assembly technique resulted in excess Loctite being deposited on the blocker screw and subsequently transferred to the trigger when the blocker contacts the trigger. . . .

The PCR motion explained that Remington's chief engineer on the XMP trigger determined that the excess Loctite was a mistake in the manufacturing process. "[T]he excess sealant (Loctite) causes the blocker screw to 'stick' to the trigger which creates a dangerously defective condition. . . ." A Remington investigation found that "some XMP triggers *might have* excess bonding agent used in the assembly process" which could, "*under certain circumstances*," cause the rifle to "unintentionally discharge." (Emphasis added). Remington recommended that those owners of the recalled rifles stop usage and return the rifle to them to be "inspected and specialty cleaned" in order to "remove any potential excess bonding agent."

¶20. Stringer attached multiple exhibits and affidavits to his PCR motion. In Stringer's affidavit dated March 2017, attached to his motion, he claimed that he never had any problems with his rifle before the night Justin was killed. However, that night, Stringer maintained that he never had his hand or finger on the trigger before his rifle fired; he just

---

[7] For this explanation of the XMP recall, Stringer quoted Exhibit Six, attached to his PCR motion. Part of this exhibit was the affidavit of attorney Robert Chaffin, who handled numerous national product liability cases involving the Remington 700 XMP rifles.

9

heard a "click," and the rifle went off. Stringer stated: "The bullet from the rifle hit my brother in the forehead and killed him." Roger also submitted an affidavit stating that initially he had not believed his son's claim that he did not have his finger on the trigger when Justin was shot and killed. However, after Roger learned of the Remington XMP recall, he believed his son's claim.

¶21. Stringer argued that this new evidence provided substantial support for his explanation that the shooting was an accident, and the evidence would likely change the outcome of a new trial if granted—i.e., he would not be convicted of manslaughter. Stringer claimed the recall evidence would contradict the majority of Beall's testimony regarding her functionality and firing-mechanism testing. However, in June 2018, Beall provided an affidavit that "[t]he fact of the recall would not have changed the [functionality] testing [she] conducted on this weapon [in 2013], nor would it if asked to perform a future functionality test."

¶22. In July 2023, the trial court again ordered the rifle to be professionally tested and examined, this time using a specific inspection protocol[8] agreed upon by the parties and the court. The purpose of the examination was to determine if the rifle had the condition under the XMP recall—the excess bonding agent, Loctite, in the trigger's blocking screw—which could lead to an unintentional discharge. On April 15, 2024, the rifle examination occurred at the Mississippi Forensics Laboratory on the Gulf Coast. The video and results are part of our record. Present for the examination were Stringer, counsel for both parties, Stringer's

---

[8] The inspection protocol was created by Derrick Watkins, a former engineer with Remington, who was responsible for prompting the XMP recall.

10

expert Henry Belk, the trial court judge, and others. The inspection was conducted by Beall and two other firearm experts. The video, which lasted approximately an hour and ten minutes, showed that the inspection protocols were followed precisely. The unloaded rifle's bolt was closed with the safety in the "on/safe" position. The safety was then moved to the "off/fire" position. If the gun were to "dry fire" (discharge absent ammunition), the rifle failed the test. However, the motion of the safety did not cause the rifle to "dry fire" (discharge absent ammunition); therefore, the rifle passed this test.

¶23. Firearm experts then thoroughly inspected the rifle, taking videos and photographs, which included videos with a borescope and digital microscopic images. The barrel was removed from the stock. The safety's trigger-blocking screw was examined for the presence of excess Loctite. None was found. The blocking screw and trigger appeared normal. A video was taken of "the blocker screw being repeatedly actuated against the trigger." "Adjustment screws of the fire control" were examined for signs of tampering. Experts performed function checks, and the trigger pull was measured. The results of the inspection showed no conditions or malfunctions that would cause the rifle to unintentionally discharge.

¶24. On October 2, 2024, an evidentiary hearing was held on Stringer's PCR motion. The only witness[9] was Stringer's father, who testified that if his son were to be granted a new trial, his testimony would be different: "Well, I testified back then that there was no way that that gun could fire without a trigger being pulled. And through everything that I read in the

---

[9] The State explained that it did not present an expert because the State did not have the burden of proof.

11

past nine years I know better now." However, during cross-examination Roger admitted that he did not specifically testify at trial the "the gun could or couldn't fire without the trigger being pulled." Regardless, Roger stated his testimony now would be that in his opinion, "there's a possibility," based upon his reading, that the rifle could misfire without the trigger's being pulled. Roger agreed that in his experience with firearms, when the safety disengages, a "click" is heard. Roger also admitted that his son told law enforcement he had loaded his firearm prior to June 11, 2011, but never unloaded it.

¶25. Additionally, the State questioned Roger about Exhibit P-4, which he had originally attached in support of his October 2024 affidavit.[10] Exhibit P-4 consisted of seventeen customer complaints with recalled Remington 700 rifles with XMP triggers. Stringer had compiled these complaints after reviewing "thousands of pages of documents regarding Remington rifles" and customer complaints. The reports showed incidents where, after the rifles were repaired and returned to their owners, the rifles continued to discharge unintentionally under certain conditions. These conditions included opening or closing the bolt, releasing the safety (turning it off), or the discharge being unexplained by the customer. However, Remington could not duplicate a misfire in any of these cases, and nobody was injured in the incidents. Roger agreed that he could not say any of these seventeen incident reports or conditions specifically applied to Stringer's rifle.[11] The State emphasized the fact

---

[10] Stringer submitted four exhibits during the hearing: a Remington recall notice, a Remington recall reminder notice sent to Roger in the mail, an empty recall box to send the rifle to Remington, and the Remington customer complaints compiled by Roger.

[11] The State noted that Stringer told law enforcement he did not manipulate the bolt during the shooting.

that on Stringer's rifle, there was no excessive Loctite on the blocking screw, which was the cause of the recall.

¶26. On October 9, 2024, the trial court issued a detailed memorandum opinion and order denying Stringer post-conviction relief. After having presided over the criminal trial and reviewed the PCR proceedings, the court found:

> In this Court's opinion, the new evidence Stringer wishes to put in front of a new jury is, essentially, this rifle fell into a category of rifles which Remington recalled so they could be inspected for conditions pertaining to the trigger which, if present, could cause the rifle to discharge without pulling the trigger, however, after multiple tests and one thorough inspection, none of the conditions were found with the rifle at issue in the trial.

The trial court noted that Stringer's defense at trial was "accident." Importantly, the jury did not find that Stringer intentionally killed his brother, Justin, but did find that he was culpably negligent, thereby convicting him of manslaughter, not deliberate-design murder, as he was charged. The trial court cited the supreme court's opinion affirming Stringer's conviction for manslaughter notwithstanding Stringer's claim of accident:

> Zachary argues that he did not know the rifle was loaded, and he did not deliberately point the rifle at Justin. The evidence, however, tells a different story. In at least one statement, Zachary admits that he loaded the rifle and threatened to shoot Justin. Also, the physical evidence—Justin's gunshot wound—suggests that the rifle could have been pointed directly at Justin's head.

*Stringer*, 131 So. 3d at 1191 (¶37). The trial court concluded that Stringer failed to establish, by a preponderance of the evidence, that the evidence on the Remington XMP recall "w[ould] probably" change the results if a new trial were granted. The trial court thus denied Stringer's request for post-conviction relief.

13

**STANDARD OF REVIEW**

¶27. "The appropriate standard of review for denial of [a PCR motion] after an evidentiary hearing is the clearly erroneous standard." *Kidd v. State*, 221 So. 3d 1041, 1043 (¶8) (Miss. Ct. App. 2016) (quoting *Davis v. State*, 980 So. 2d 951, 954 (¶5) (Miss. Ct. App. 2007)). When reviewing evidentiary hearings in PCR cases,

> we will not set aside a trial court's finding unless it is clearly erroneous. Put otherwise, we will not vacate such a finding unless, although there is evidence to support it, we are on the entire evidence left with the definite and firm conviction that a mistake has been made.

*Meeks v. State*, 781 So. 2d 109, 111 (¶5) (Miss. 2001) (quoting *Rochell v. State*, 748 So. 2d 103, 109 (¶20) (Miss. 1999)). Where questions of law are raised, the standard of review is de novo. *Id.*

**ANALYSIS**

¶28. We apply the Mississippi Supreme Court's articulated requirements to warrant granting a new trial based upon newly discovered evidence:

> it must be shown that the evidence (1) will probably change the result if a new trial is granted, (2) has been discovered since the trial, (3) could not have been discovered before the trial by the exercise of due diligence, (4) is material to the issue, and (5) is not merely cumulative, or impeaching.

*Hunt v. State*, 877 So. 2d 503, 510 (¶34) (Miss. Ct. App. 2004) (quoting *Moore v. State*, 508 So. 2d 666, 668 (Miss. 1987)). "[T]he determination of whether new evidence would probably change the results of a new trial is committed to the sound discretion of the trial judge." *Moore*, 508 So. 2d at 668. "The PCR movant has the burden of showing he is entitled to relief by a preponderance of the evidence." *Kidd*, 221 So. 3d at 1043 (¶8); *accord*

14

Miss. Code Ann. § 99-39-23(7) (Rev. 2020).

¶29. Stringer argues that the trial court erred in denying his PCR motion because he satisfied the above requirements for a new trial. Specifically, on appeal, Stringer narrows his argument to the newly discovered evidence of the Remington recall, a change in his father's testimony, and Exhibit P-4, which would "probably change the result if a new trial was granted."[12] Stringer contends this new evidence corroborates his position that he never pulled the rifle's trigger during the shooting. We are not persuaded.

### The Remington Recall

¶30. Stringer claims the Remington recall corroborates his theory at trial that the shooting was an accident and that his rifle discharged without his pulling the trigger, killing Justin. Further, Stringer argues the recall would refute the State's witnesses. Stringer maintains the trial court overlooked the impact of this material evidence.

¶31. Stringer seems to argue that his rifle, as part of the recall, could spontaneously fire at any time without a trigger pull, but this is not the case. The recall indicated that "some," but not all, XMP triggers, "might" have the excess bonding agent Loctite, which could, "under certain circumstances," cause the rifle to unintentionally discharge. Stringer's rifle was tested several times for functional reliability and never accidentally discharged. Most importantly, the rifle was thoroughly inspected and found not to contain excess Loctite, which could possibly cause an unintentional discharge. Nor does the recall refute Beall's

---

[12] Only the first requirement (to show the evidence would probably change the result) is at issue here. The parties do not dispute that the new evidence of the Remington recall was discovered after the trial and appeal, it could not have been discovered before the trial, it was material, and it would be used to corroborate Stringer's version of events.

15

testimony, as Stringer contends. Beall testified that there was "no accidental discharge" of the rifle when she performed the functional reliability tests described above. Beall concluded the rifle was "in good working order." The recall would not change her testimony—it remains true now. In fact, in June 2018, Beall submitted an affidavit as part of the State's response to Stringer's PCR motion, stating that the recall would not have changed the testing she performed on the rifle before the trial.

¶32. The recall does not change the evidence that Stringer had a loaded gun, with the safety off, pointed at Justin's forehead.

### Roger's Testimony

¶33. Stringer claims his father's testimony would change the outcome of a new trial because now it would be more favorable to his son after discovering the recall. At the evidentiary hearing, Roger admitted that at the time of his son's trial, he did not believe Stringer's rifle could fire without pulling the trigger, but now he believes it could have. However, at trial, Roger did not testify that Stringer's rifle would not fire without the trigger being pulled—a fact that the State corrected him on during the evidentiary hearing. In fact, Roger's trial testimony was not nearly as damning to his son as he now claims, despite his testifying for the State. At trial, Roger expressed doubt about Stringer's first explanation at the scene of the shooting (that Justin committed suicide). Indeed, Stringer later admitted he lied. Roger testified about both sons being educated on gun safety and that Stringer could safely and properly operate his rifle. Roger testified the gun had never had mechanical problems or misfired, and it had a "hard trigger." This testimony remains accurate even after

16

the recall and would not change if he were examined again on it.

¶34.    Now, Roger claims his testimony would be that the rifle could possibly fire without the trigger's being pulled.  First, it is unclear if Roger's new testimony about the rifle would even be admissible at a new trial because he is not an expert.  Second, while Roger could testify about discovering the recall, we cannot say this probably would change the result of a new trial.  The trial court's ruling in this regard is certainly not clearly erroneous. Stringer's rifle was found to be in good working order and did not have the condition of the recall.

### Exhibit P-4: Remington Customer Complaints

¶35.    Stringer argues that the trial court "did not take into account" Exhibit P-4 because if the court had, it would have granted a new trial.  We disagree.  The trial court did not "overlook" the significance of these reports, as Stringer suggests.  At the evidentiary hearing, both parties examined Roger about the exhibit, which he had attached to his October 2024 affidavit.  He picked these seventeen complaints out of thousands to support his affidavit that the rifle could unintentionally discharge under certain conditions.  The customer complaints showed these rifles, from all over the country, were repaired by Remington under the recall, but the customers alleged the rifles still malfunctioned once returned to them.  They reported that the rifle fired during opening or closing the bolt or when releasing the safety (turning it off), or the discharge was unexplained.  However, Remington was unable to duplicate the customers' concerns in any of these cases.  Here, while Stringer's rifle was included in the recall, it did not have the condition described in

17

the recall—there was no excess Loctite on the blocking screw to cause it to misfire. Further, during cross-examination at the evidentiary hearing, Roger admitted that he could not say any of these complaints applied to his son's rifle. Moreover, in Stringer's statements, none of these conditions described in the exhibit occurred when the rifle fired, killing Justin. This exhibit would not change the outcome of a new trial.

### The 2024 Rifle Inspection

¶36. Additionally, Stringer complains that the trial court's opinion improperly relied "almost exclusively" on the rifle inspection performed at the Mississippi Forensics Lab in April 2024. We disagree. The trial court specifically noted what was relied upon in rendering the decision. In addition to observing first-hand the April 2024 rifle inspection, the court "thoroughly examined" twelve pleadings in the PCR proceeding, listing each of them, as well as oral arguments by counsel at the October 2024 evidentiary hearing. The court also "reviewed the pleadings contained in the underlying criminal case" and reread the supreme court's opinion affirming Stringer's conviction. The trial court judge noted that he presided over Stringer's criminal trial, hearing the testimony of the witnesses first-hand. We cannot say that the trial court relied exclusively upon the 2024 rifle inspection.

¶37. That said, the rifle inspection was important in determining whether Stringer's rifle had the condition described in the recall. The court found that "after multiple tests and one thorough inspection, none of the [recall] conditions were found with the rifle at issue. . . ." Stringer also complains that the inspection failed to "replicate the variables present when the shooting occurred. . . ." However, replicating the shooting that killed Justin was not the

18

purpose of the inspection; the purpose was to see if the rifle contained the conditions of the recall that would cause the rifle to discharge unintentionally. The rifle did not. Further, we fail to see how "replicat[ing] the variables present" during the actual shooting, as Stringer suggests, would even be possible, and Stringer does not elaborate.

### *Hunt v. State*

¶38. Stringer cites *Hunt* in support of his argument. There, this Court reversed the trial court's denial of Hunt's PCR motion based upon newly discovered evidence, vacating his conviction of rape and remanding for a new trial. *Hunt*, 877 So. 2d at 505-06 (¶¶1, 4). The new evidence came in the form of testimony or affidavits from three witnesses. *Id.* at 507 (¶15). A previously unknown witness testified at the evidentiary hearing that she had been a close friend of the victim. *Id.* at 505 (¶1). This Court found her testimony "supported in significant ways" the defendant's testimony at trial that he had consensual sex with the victim, and her testimony also impeached the victim's trial testimony. *Id.* at 506, 514 (¶¶3, 62). This Court stated the decision to grant a new trial is not just technical, but under "the requirements set out by caselaw, the court is to consider whether all the evidence presented leaves a 'definite and firm conviction that a mistake has been made.'" *Id.* at 514 (¶61). In granting a new trial, the *Hunt* court explained that while "[t]he decision is subjective," the new evidence "raise[d] too many significant questions about whether a mistake was made for us to permit this conviction to stand." *Id.* at 513-14 (¶¶52, 62).

¶39. While *Hunt* is instructive in its analysis for granting a new trial, the facts are distinguishable. In *Hunt*, like many sexual assault cases, the defendant's first trial "was

strictly a battle of credibility" between Hunt and the victim. *Id.* at 506 (¶4). The new evidence, from multiple witnesses, showed that the victim had a motive for fabricating the rape—to hide from her fiancé that she was having consensual sex with another man. *Id.* at (¶3). Importantly, it corroborated Hunt's testimony in his own defense that the encounter was consensual. *Id.* at (¶8). Therefore, this Court concluded that in a new trial, if the new witnesses were called to testify, and if their testimony was similar to that presented in the record, "a much different case will exist for a jury," and the "jury issue is dramatically altered." *Id.* at 514 (¶62). That would not be the case here. In light of the recall, none of the testimony presented at trial would materially change in a new trial, as previously discussed.

## CONCLUSION

¶40. The newly discovered evidence does not leave "a definite and firm conviction that a mistake has been made." The jury found that Stringer's shooting Justin was not intentional but that he was culpably negligent. The physical evidence is irrefutable: Stringer had a loaded rifle, and Justin's gunshot wound to his forehead meant the rifle was pointed directly at Justin's head. Stringer even admitted in his affidavit that the bullet hit Justin in the forehead. For these actions, the jury found Stringer culpably negligent. The newly discovered evidence would not change these facts or the outcome of a new trial. The trial court did not err in denying Stringer's PCR motion requesting his manslaughter conviction be set aside and a new trial granted based upon newly discovered evidence. Accordingly, we affirm the order denying post-conviction relief.

¶41. **AFFIRMED.**

**WILSON, P.J., McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., NOT PARTICIPATING.**